**PEOPLES BANK & TRUST COMPANY,**
**Appellant–Plaintiff,**

v.

**Henry J. PRICE, Appellee–Defendant.**

**No. 49A04–9810–CV–490.**

Court of Appeals of Indiana.

July 23, 1999.

713

Christopher E. Baker, R. Brock Jordan, Rubin & Levin, Indianapolis, Indiana, Attorneys for Appellant.

William C. Potter, II, Audrey M. Bougard, Price, Potter & Mellowitz, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

BAILEY, Judge

### Case Summary

Appellant–Plaintiff Peoples·Bank & Trust Co. ("Peoples") brings this interlocutory appeal of the denial of its motion for summary judgment in its lawsuit based on three promissory notes executed by Appellee–Defendant Henry J. Price ("Price"). We reverse.

## Issue

The dispositive issue may be restated as whether Peoples is entitled to summary judgment in its action to collect on three promissory notes executed by Price.

## Facts

The operative facts are undisputed. In 1995, Price and Timothy Luther ("Luther") entered into an arrangement to finance the purchase of luxury automobiles that Luther thought he could resell at a profit. (R. 89). Price would execute a promissory note to Peoples, obtain a check payable to both Price. and Luther, and then endorse the check and provide it to Luther for the purchase of a car. (R. 89–90). When Luther sold the car, he was to apply the proceeds to pay off the note and split the profits with Price. (R. 90).

Beginning in August of 1995, Price borrowed a total of $148,200.00 from Peoples under the terms of three promissory notes styled "Fixed Rate Consumer Note, Disclosure and Security Agreement," each representing the purchase of a Mercedes automobile. (R. 14, 18, 22). Price was the only person who signed the notes and signed in the capacity of "borrower." (R. 14, 18, 22). Each note provided that it would be secured by the particular Mercedes automobile to be purchased and specified by the serial number or vehicle identification number ("VIN") of that car. (R. 14, 18, 22). The notes contained the following covenants:

Borrower covenants and warrants that:

(a) INSURANCE. The collateral will be kept insured for its full value against all hazards including loss or damage caused by fire, collision, theft or other casualty. . . .

(b) OWNERSHIP. Borrower is the sole owner of the Collateral and no other person or organization has a security interest in or claim to the Collateral. . . .

(c) PURPOSE/USE OF COLLATERAL. The Collateral will be used primarily for personal, family or household purposes and will be kept at the Borrower's address indicated on the reverse. . . .

(d) MAINTENANCE. The Collateral is presently in good condition. Borrower, at his/her expense, will keep the Collateral in good condition. If the Collateral is a motor vehicle, Borrower shall maintain and service the vehicle as recommended by the manufacturer and as needed to keep the vehicle in good operating condition. Borrower will replace and repair all parts of the Collateral as may be necessary from time to time and will not permit any lien to be created because of such repairs. Borrower will permit Lender to inspect the Collateral at any reasonable time.

(R. 15, 19, 23). The promissory notes provided that in the event of default, Peoples had the right to accelerate all payments and demand all amounts owing, including the costs of collection and reasonable attorney fees. (R. 15, 19, 23).

In conjunction with the closing of this type of loan, the bank officer would complete a form styled "CONSUMER LOAN APPROVAL CHECKLIST." (R. 95). These checklists read as follows:

APPROVED SUBJECT TO THE FOLLOWING CONDITIONS:

_/_ PURCHASE: Check payable to customer and dealer with restrictive endorsement stamp.
___ REFINANCE: Title application form 44049, ST–108 or ST–108Em $5.00 title fee and title.
_/_ VERIFICATION OF VEHICLE IDENTIFICATION NUMBER
_/_ VERIFICATION OF WHO IS THE DEALER/SELLER

EVIDENCE THAT THE ABOVE CONDITIONS ARE MET MUST BE INCLUDED IN THE LOAN PACKAGE.

(R. 95). The bank officer would note on the checklist that the loans were "ready to close." (R. 95).

Upon the execution of each note, Peoples would provide Price with a check payable to both Price and Luther. (R. 41–43). Each of the three checks contained a restrictive en-

dorsement providing that title to the vehicle in question would be placed in the name of Price, and, that Price, by accepting and/or endorsing the check, guaranteed that the application for Certificate of Title would show that Peoples maintained a first lien on each of the respective vehicles. (R. 41–43). Price endorsed each of the three checks and provided them to Luther. (R. 41–43).

Luther made sporadic payments on the notes with checks issued from his business known as "Jim Britts Motorsports, Inc." (R. 97–111). However, in the later part of 1996, it was discovered that the cars which purported to secure the notes were fictitious. (R. 91). As there was no collateral securing the notes, Peoples accelerated the balance due and ultimately filed the present lawsuit against Price to enforce its rights under the notes. (R. 10).

Price answered the complaint denying any liability under the notes. (R. 31–32). Price raised affirmative defenses including his argument that the proximate cause of People's damages was its failure to obtain the titles to the vehicles in question or to ascertain whether the VINs listed in the notes actually existed. (R. 32). Price counterclaimed against Peoples alleging that it was liable to him for the damages he incurred due to Peoples' negligence in failing to verify the existence of the identification numbers. (R. 34).

Peoples moved for summary judgment on its claims under the notes as well as upon Price's counterclaim. Price made the following assertions by affidavit:

4. When Luther proposed this transaction to me, Luther told me that he had an ongoing business relationship with Peoples through his operation Jim Britts Motorsports involving identical transactions with other individuals. In fact, I was informed by Luther that a Fred Hyche at People's Winona Branch would take care of all the necessary documentation and that all I had to do was sign the documents prepared by Peoples. It was also my understanding that Peoples had no problems in its past dealings with Luther, and that Peoples, as the actual holder of the lien on the vehicle, would take the necessary actions to perfect their security interest in the vehicle. Based on these understandings, I agreed with Peoples to finance an automobile for Luther.

. . . .

7. In early October 1995, Luther represented to me that the first vehicle had been sold, that the loan had been paid off, and solicited me as to whether I was interested in financing a second automobile. I indicated that I was. Like the first loan, Peoples completed all the necessary documentation to effect the loan and my only involvement in the transaction was to appear and sign the documents presented by Peoples. . . . I was never told by Peoples that the first loan was still active and had never been paid-off by Luther. . . . [the third transaction mirrored the previous two]

. . . [the third transaction mirrored the previous two]

11. Luther, a nonparty to this action, did not provide the titles to such vehicles to me and apparently did not provide them to Peoples Bank and Trust Company either. Upon subsequent investigation resulting from the default of the payment of these loans by Luther, it was learned that the vehicles never existed and that the VIN numbers were phony. Thus, no titles could ever have existed on these vehicles.

11. [sic] It was Peoples['] responsibility under the documents to verify the VIN numbers and to obtain the titles to these vehicles to perfect their security interest and to protect my interest in the security that was given for these loans. Peoples failed to either verify such VIN numbers or obtain these titles from Luther.

12. . . . Peoples subsequently investigated and found that the vehicles did not exist. If Peoples had investigated the identification numbers and serial numbers at the time of the making of these loans, or had fulfilled its obligation to obtain the titles, Peoples would have discovered that the numbers were false.

13. Peoples' negligence in ascertaining that the titles' claimed vehicle numbers were false and that the vehicles therefore

did not exist has caused me damages in an amount to be proven at trial.

(R. 92).

■ The trial court denied Peoples' motions for summary judgment finding in pertinent part as follows:

Considering all the facts and circumstances surrounding these transactions, there is a question of material fact as to whether [Peoples] breached a duty it owed or assumed to Price to verify the VIN numbers of the automobiles which were to serve as security for these notes prior to consummation of the three loan transactions.

(R. 174).[1] This appeal ensued.

## Discussion and Decision

### A. Standard of Review

As stated in *Stevenson v. Hamilton Mutual Insurance Company*, 672 N.E.2d 467, 470–71 (Ind.Ct.App.1996), *trans. denied:*

In reviewing a motion for summary judgment, this court applies the same standard as the trial court. We must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court. Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Neither the trial court, nor the reviewing court, may look beyond the evidence specifically designated to the trial court. Once the movant for summary judgment has established that no genuine issue of material fact exists by submission of materials contemplated by T.R. 56, the nonmovant may not rest on his pleadings but must set forth specific facts, using supporting materials contemplated under the rule, which show the existence of a genuine issue for trial. A trial court's grant of summary judgment is 'clothed with a presumption of validity,' and the

appellant bears the burden of demonstrating that the trial court erred.

(citations omitted).

### B. Freedom to Contract

■ Our supreme court has recently confirmed its commitment to advancing the public policy in favor of enforcing contracts. *See Trimble v. Ameritech Publishing, Inc.*, 700 N.E.2d 1128, 1129 (Ind.1998) (citing *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind.1995)). Indiana courts recognize that it is in the best interest of the public not to unnecessarily restrict persons' freedom to contract. *Id.* Thus, as a general rule, the law allows competent adults the utmost liberty in entering into contracts which, when entered into freely and voluntarily, will be enforced by the courts. *Federal Kemper Ins. Co. v. Brown*, 674 N.E.2d 1030, 1033 (Ind.Ct.App. 1997), *trans. denied.* Nevertheless, despite the very strong presumption of enforceability, courts have refused to enforce private agreements that contravene statute, clearly tend to injure the public in some way, or are otherwise contrary to the declared public policy of Indiana. *Continental Basketball Ass'n, Inc. v. Ellenstein Enterprises, Inc.*, 669 N.E.2d 134, 139 (Ind.1996).

### C. Interpretation of Contracts

■ Construction of the terms of a written contract is a pure question of law for the court; thus, our standard of review is de novo. *George S. May International Co. v. King*, 629 N.E.2d 257, 260 (Ind.Ct.App.1994), *trans. denied.* The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. *Turnpaugh v. Wolf*, 482 N.E.2d 506, 508 (Ind.Ct. App.1985). If the language of the instrument is unambiguous, the intent of the parties is determined from the four corners of that instrument. *Id.* If, however, a contract is ambiguous or uncertain, its meaning is to be determined by extrinsic evidence and its construction is a matter for the fact finder. *Bicknell Minerals, Inc. v. Tilly*, 570 N.E.2d 1307, 1310 (Ind.Ct.App.1991), *trans. denied.*

---

1. Although trial court findings entered in summary judgment proceedings aid appellate review, they are not binding upon this court. *Althaus v.*

*Evansville Courier Co.*, 615 N.E.2d 441, 444 (Ind. Ct.App.1993).

In interpreting a written contract, the court should attempt to determine the intent of the parties at the time the contract was made as discovered by the language used to express their rights and duties. *Id.* at 1313. The contract is to be read as a whole when trying to ascertain the intent of the parties. *Id.* The court will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. *Id.* at 1316. The court must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting. *Id.* Moreover, in the absence of anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction or subject matter will, as a general proposition, be construed together. *Beradi v. Hardware Wholesalers, Inc.*, 625 N.E.2d 1259, 1261 (Ind.Ct.App. 1993), *trans. denied.*

 Parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence. *Turnpaugh,* 482 N.E.2d at 508. The existence of express terms in a valid written contract precludes the substitution of any implied terms regarding the subject matter covered by the express terms. *Keystone Carbon Co. v. Black,* 599 N.E.2d 213, 216 (Ind.Ct.App.1992), *trans. denied.* This principle is especially true in Indiana because our courts will zealously defend the freedom to contract. *Id.; Fresh Cut,* 650 N.E.2d at 1129.

### D. Analysis

 Under the express terms of the notes and the restrictive endorsements of the checks as discussed above, the responsibility to ensure that the notes were kept secured by the cars in question fell squarely upon Price, and not Peoples. Price promised to insure the cars and keep them at his own address. By endorsing the checks, Price guaranteed that the titles would show that Peoples maintained a first lien securing its loans. Price cannot justify his breach of express contractual obligations on the basis that Peoples may have failed to verify the existence of the automobiles for itself. Nor can Price justify his breach of express contractual terms by stating that he had understood that Peoples had assumed the responsibility for perfecting its security interest in the cars. *See Woodall v. Citizens Banking Co.,* 503 N.E.2d 427, 428–30 (Ind.Ct.App. 1987) (where the express terms of the mortgage required the homeowner to warrant and defend the title against mechanics liens, the homeowner would not be heard to argue that the bank had voluntarily assumed the duty to discharge mechanics liens), *trans. denied.* Accordingly, Peoples is entitled to summary judgment on the notes.

Therefore, we must reverse and remand with instructions that the trial court enter summary judgment in favor of Peoples and conduct any further proceedings necessary to determine Price's liability thereunder.

Reversed.

STATON, J., and ROBB, J., concur.