**Peter MANZON, Plaintiff,**

v.

**STANT CORPORATION, Defendant.**

**No. IP 99–1789–C–B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 17, 2002.

Mary Lee Schiff, Ziemer Stayman Weitzel & Shoulders, Evansville, IN, for plaintiff.

Michael A. Moffatt, Ogletree Deakins Nash Smoak & Stewar, Indianapolis, IN, for defendant.

### ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BARKER, Chief Judge.

On July 28, 1999, Peter Manzon sued Stant Corporation ("Stant"), his former employer, for breach of contract and for violation of Indiana's Wage Act, Ind.Code § 22–2–5–1 *et seq.* Defendant counterclaimed for conversion of a company vehicle in violation of Ind.Code § 35–43–4–3 and § 35–24–3–1. Summary judgment was granted to Defendant on the statutory wage claim on March 30, 2001. At that time, the Court also entered summary judgment in favor of Plaintiff on the conversion counterclaim. Before the court are cross motions for summary judgment on the breach of contract claim. For the reasons set forth below, Defendant's Motion for Summary Judgment is *DENIED.* We *GRANT* Plaintiff's Motion for Partial Summary Judgment.

### Background Facts

#### Manzon's Employment at Stant

Manzon worked at Stant as its Executive Vice President and as General Manager of Standard–Thomson Corporation, a wholly owned subsidiary of Stant. On May 7, 1997, Stant was acquired by Tomkins Corporation and E & W Acquisition Corp. Tomkins also had recently acquired The Gates Corporation d/b/a The Gates Rubber Company ("Gates"). In April of 1998, Tomkins acquired another company, Schrader–Bridgeport. Following this acquisition, Jim Wiggins served as president of the Stant Companies and the Schrader Companies. These two companies were reorganized into a new Fluid Systems division in March of 1999. Later that month, Wiggins decided to terminate Manzon's employment and notified Manzon of this fact on March 29, 1999. Manzon continued to report to work through the first week of April. During this time, he discussed operations at one of the plants with Brian Bauer, a manager at the Schrader Companies, to whom Manzon's responsibilities were assigned. Bauer eventually told Manzon that he "felt it would be better and easier for all parties concerned if [Manzon] did not come into the building when [Bauer] was there." Bauer Dep. at 89. Under the Employment Agreement, the effective date of Manzon's termination was May 31, 1999.

### The Employment Agreement

The terms of Manzon's employment and his severance package are governed by an Employment Agreement entered into on October 31, 1996. Ex. 40. The provisions of the contract are set forth in greater detail below, but an overview is appropriate here. Section 4(c) of the contract provides that Manzon is entitled to certain severance benefits if his employment is terminated following a change in control of ownership of Stant. These benefits may be reduced, however, if appropriate pursuant to section 4(d) of the Employment Agreement, a clause of the contract dealing with section 280G of the Tax Code. Section 280G of the Tax Code prohibits a corporate employer from deducting from its taxes any amount that constitutes an excess parachute payment to a corporate executive as the result of a change in control of the corporate employer. 26 U.S.C. § 280G. Section 4(d) states that Manzon's severance benefit will be reduced if Stant would not be able to deduct for federal income tax purposes any part of the severance benefit by reason of section 280G of the Tax Code. Section 5(b), another provision of the contract important to this dispute, requires Manzon to release the company from liability to him arising out of his employment, except that Manzon need not release Stant from liabil-

ity based on breach of the Employment Agreement.

## Severance Benefits and Negotiations

Following the notice of termination, Mary Kloepfer, legal counsel for Gates, drafted a letter setting forth the specific amounts and benefits Stant was willing to pay Manzon in full satisfaction of its obligations under the Employment Agreement in return for a full release. On May 10, 1999, Wiggins gave this letter to Manzon. Ex. 14. Manzon's legal counsel, Mary Lee Schiff, reviewed the letter, and on May 12, 1999, she sent a letter to Kloepfer contending that the amounts were inconsistent with the terms of Manzon's Employment Agreement. Pl.'s Tab II, # 100061. Schiff also asked to review the determination under section 280G of the Tax Code prepared by the company's accountants. *Id.* In response, Kloepfer sent to Schiff the opinion prepared by the accounting firm of Deloitte & Touche, LLP. Pl.'s Tab II, # 100092. Stant had terminated a number of executives with Employment Agreements similar to that of Manzon's, and Deloitte & Touche had done section 280G calculations for each of these executives, including Manzon. From there, the parties' lawyers continued to exchange letters contesting the severance benefits to which Manzon is entitled under the Employment Agreement. Their dispute gave rise to this litigation, and the Complaint was filed on July 28, 1999.

## The Parties' Theories of the Case

The parties have filed cross motions for summary judgment on Manzon's claim for the benefits allegedly owed him under the Employment Agreement entered into with Stant on October 31, 1996. The parties agree that, because Manzon's employment was terminated by Stant for its convenience following a change of control of the company, section 4(c) of the contract establishes that Manzon is entitled to certain "change of control" benefits. Both parties also acknowledge that Manzon has not been paid any portion of the disputed amount set forth in the contract. About apparently everything else, they disagree heartily.

Defendant seeks summary judgment on all claims raised by Manzon. Under Stant's theory of the case, while section 4(c) provides that certain benefits should be paid to Manzon, section 4(d) establishes that the amounts due under section 4(c) are subject to reduction for tax purposes. Defendant contends that it offered to pay Manzon the proper amounts, as required by section 4(d) and as determined by Deloitte & Touche, and that because Deloitte & Touche's calculation of the necessary reductions is binding on Manzon, Stant cannot be held liable under the contract. Plaintiff opposes Stant's motion with the argument that section 4(d) requires more process than Deloitte & Touche's calculation and that Stant did not fulfill these obligations.

Plaintiff seeks only partial summary judgment. Specifically, Plaintiff asks the Court to find that Defendant is liable under the contract because, as a matter of law, Stant breached the Employment Agreement. Manzon further moves for summary judgment that Stant is liable for attorney fees and costs under the contract. Finally, Plaintiff asks that a trial be scheduled to determine the amount of damages and attorney fees and costs due to him pursuant to the Employment Agreement.[1] Manzon submits that Stant breached the contract in one or both of two ways: (1) by not yet paying to Manzon the amounts he is entitled to receive under certain subsec-

---

1. Federal Rule of Civil Procedure 56(c) permits "summary judgment, interlocutory in character ... on the issue of liability alone although there is a genuine issue as to the amount of damages."

tions of section 4(c) and/or (2) by violating section 4(d) of the Employment Agreement when it failed to follow the contractually-required procedure for calculating tax-related reductions in his severance benefits. One of Stant's arguments in opposition to Plaintiff's motion for partial summary judgment is, not surprisingly, the same as its argument for summary judgment in its favor. Namely, according to Defendant, offering to Manzon the amounts set forth in Deloitte & Touche's binding determination precludes the Court from finding that Stant breached the contract as a matter of law. Stant also defends its failure to pay the severance benefits on the ground that Manzon has thus far neglected to fulfill the condition precedent of signing a general release as required by section 5(b) of the Employment Agreement.

We address the parties' interpretations of these various sections of the Employment Agreement in light of the standard for summary judgment and Indiana rules of contract interpretation.

### Standard for Summary Judgment as Applied to Contract Cases

 The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted if the designated evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Generally, construction of a written contract is a question of law for which summary judgment is particularly appropriate." *Northern Indiana Public Service Co. v. Dabagia*, 721 N.E.2d 294, 299 (Ind. Ct.App.1999) (citation omitted). Only

when a contract is ambiguous or uncertain in its terms will extrinsic facts be useful in construing the contract and ascertaining the intent of the parties. *See Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995). Otherwise, interpretation of the contract "is purely a question of law to be determined by the trial court." *Id.* (citation omitted). Hence, our job is to determine whether the Employment Agreement is ambiguous in any of its terms material to the dispute before us. In considering this question, we must draw all reasonable inferences in the light most favorable to the non-moving party. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.1992). Summary judgment is required only if it is clear that the non-moving party will be unable to satisfy the legal requirements necessary to establish his or her case or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Section 4(c) Severance Benefits

As explained above, the parties' disagreement focuses on whether section 4(d) permits Defendant to reduce Manzon's severance benefits under section 4(c) in reliance on Deloitte & Touche's calculations pursuant to section 280G of the Tax Code. To some degree, the parties agree on the details of what section 4(c) requires, but, with regard to one provision of section 4(c), the parties present extensive argument for their respective positions. We respond to their contentions below and determine that there is no genuine issue of material fact that subsection 4(c)(iii) requires Stant to pay incentive compensation to Manzon, subject to reduction under section 4(d). In addition, before addressing the viability of Stant's defense based on section 4(d), we explain other provisions of section 4(c). However, because the extent of and bases for the parties' disagreement on these subsections is not clear from the summary judgment submissions and be-

cause resolution of these disputes is not necessary to our summary judgment ruling, we do not choose between their respective positions at this juncture.

■ The interpretation of section 4(c)(iii) is hotly contested. Another provision of the contract establishes that, during his employment, Manzon was entitled to incentive compensation if he satisfied certain job performance requirements adopted for Stant executives. Ex. 40, § 2(b). Section 4(c)(iii) provides for incentive compensation in the event that Manzon's employment is terminated. Specifically, this clause establishes that, upon termination, Manzon will be paid "any earned but unpaid compensation" under the compensation plan in which he participated while employed. Manzon claims that he is owed $91,802.00[2] in incentive compensation for fiscal year 1999. Stant maintains that Manzon is owed nothing under section 4(c)(iii).

While Stant disputes neither that Standard–Thomson, the division managed by Manzon, exceeded its financial goals nor that Manzon achieved the personal objectives required of him for the year, Defendant takes the position that Manzon did not "earn" his bonus. Stant points out that Manzon was not employed at the time bonuses were paid in 1999 and argues that the 1997–1998 Management Bonus Plan ("Bonus Plan") requires that in order to be paid a bonus the employee must be employed by Stant at the time the bonus becomes payable. The Bonus Plan states, in part:

> The bonus will be forfeited if the Participant terminates for any reason prior to the time bonuses are paid unless the termination is the result of an adminis-

trative discharge, retirement, or death . . .

Ex. 2 at 5. Plaintiff counters that the termination of his employment was the result of administrative discharge, thereby entitling him to the incentive compensation even though he was not employed on the date bonuses were paid.

■ We address whether the term "administrative discharge" applies to the circumstances of Manzon's termination. Stant offers the following definition of the term:

> An employee is administratively discharged when his/her job is eliminated, that job is not replaced within one year, and *the terminated employee does not have an Employment Agreement that provides for severance benefits.*

Wiggins Aff. ¶ 15 (emphasis added). However, as this definition is nowhere included in the contract or Bonus Plan (or in any contemporaneous document), it is not controlling. *See Western Ohio Pizza, Inc. v. Clark Oil & Refining Corp.,* 704 N.E.2d 1086, 1091 (Ind.Ct.App.1999) ("This court will not construe clear and unambiguous provisions, *nor will we add provisions not agreed upon by the parties.*") (emphasis added). Instead, we must apply the plain and obvious meaning of the language used in the contract. *Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind.1992). Based on dictionary definitions of "administrative" and "discharge," Plaintiff argues that "administrative discharge" is a management or supervisory decision ("administrative") to terminate a person's employment ("discharge"), which is exactly what happened to Manzon in this case. Stant decided that his services were no longer required so it fired him.[3]

---

**2.** This figure is equal to 50% of Manzon's base salary plus an additional amount calculated using a formula allegedly employed in past years at Stant.

**3.** Defendant attempts to refute this logic by arguing that, under Plaintiff's proffered definition, all discharges would be administrative, i.e., the result of a management decision, thereby rendering the word "administrative"

Hence, we find that Plaintiff is entitled to incentive compensation pursuant to section 4(c)(iii), subject to reduction for tax purposes under section 4(d) of the contract, an issue that we address below. Defendant also argues that even if incentive compensation is due to Manzon, the figure of $91,802.00 is incorrect. This question is reserved for trial as it pertains to damages, and Plaintiff's motion for summary judgment seeks only a determination of liability. Nor is resolution of the correct amount necessary or appropriate to the resolution of Stant's motion for summary judgment.

These same issues—reduction under section 4(d) and the exact amount of damages—are in play for most of the remainder of the subsections setting forth severance benefits, which we describe briefly here. For two provisions, the parties actually agree on the amount established by section 4(c), depending on whether section 4(d) requires deductions. Section 4(c)(viii) establishes that Stant will either permit Manzon to continue his various insurance programs or pay an amount equivalent to the cost of obtaining comparable benefits. In Wiggins' May 10, 1999 letter to Manzon, Stant offered to pay Manzon $7,968.24 in lieu of providing him with long-term disability insurance [4] in return for a release from further obligations under the contract.[5] Ex. 14 at 2. Manzon does not dispute that payment of this amount would satisfy Stant's obligation under section 4(c)(viii). Pl.'s Mot. for Summary Judgment at 22. Likewise, the parties agree that section 4(c)(x) of the Employment Agreement, which concerns Manzon's 401(k) plan, establishes that Manzon is entitled to $5,160, subject to reduction under section 4(d) of the contract.

For the three other provisions of section 4(c) at issue here, the parties' calculations differ widely. Under section 4(c)(ix), which also concerns benefit plans, Manzon claims that he is entitled to $61,693.00. Stant computes this amount at $27,109.90. Ex. 14 at 3 (5/10/99 letter from Wiggins to Manzon). Section 4(c)(vi) concerns severance benefits based on salary and incentive compensation. Plaintiff calculates this amount at $387,000.00; whereas, Stant claims that it owes only $258,000.00. Pl.'s Mot. for Summary Judgment at 20–21; Ex. 14 at 1. The last dispute under section 4(c) as to amount concerns another provision for incentive compensation. Under section 4(c)(vii), Manzon claims that he is

meaningless. As Stant correctly points out, it is contrary to the rules of contract interpretation to render a term meaningless. *Robinson v. Century Personnel, Inc.*, 678 N.E.2d 1268, 1270 (Ind.Ct.App.1997). However, the use of the adjective "administrative" serves to distinguish the type of discharge at issue here from another type of discharge that the exception to forfeiture would not include. For instance, an employee who quits her job because she finds the working conditions intolerable would fit the broad category of "discharge," but her decision to leave would be more accurately described as "constructive discharge." This type of termination is not included under the meaning of administrative discharge because a manager did not necessarily make an explicit decision to fire the person who leaves her job due to intolerable working conditions. In short, contrary to De-

fendant's argument, under the plain and ordinary meaning of "administrative discharge," the word "administrative" is not superfluous.

4. According to this letter, Manzon was able to remain enrolled in the other insurance programs, such as medical insurance and life insurance, included in section 4(c)(viii) of the contract. Ex. 14 at 2.

5. Stant contends that this letter is not an admission that it "owes" Manzon any amount of money, but an "offer" to pay Plaintiff these amounts in return for a general release. Def.'s Opp. at 6. We accept this distinction, but note that, in the absence of argument rebutting specific points from the letter raised by Manzon in his summary judgment briefing, the distinction carries little weight.

owed $5,375.00 or 50% of his salary for the month of May 1999 as unpaid incentive compensation. Pl.'s Mot. for Summary Judgment at 21–22. Defendant does not respond specifically to Manzon's contention under this provision. For these clauses, we reiterate that the exact amount due is an issue suitable for trial on damages, depending on our determination of liability based on the parties' arguments concerning other provisions of the Employment Contract.

Finally, one other provision that recurs throughout section 4(c) merits consideration here. Sections 4(c)(iii)(vi)(ix) and (x) all contain language stating that the amounts due under these sections shall be paid "within five (5) business days after the Termination Date." The parties agree that the "Termination Date" for Manzon's employment under the contract is May 31, 1999. June 7, 1999 was the fifth business day following the Termination Date. Sections 4(c)(vii) and (viii) do not specify when those amounts should be paid. Again, we note that the parties agree that no amounts under these provisions have been paid to date.

**Section 4(d) Determination of Cutbacks Pursuant to § 280G of the Tax Code**

Defendant claims that although it has not yet paid the section 4(c) severance benefits discussed above, it is entitled to summary judgment on Plaintiff's breach of contract claim. According to Stant, summary judgment is warranted because it offered, on May 10, 1999, to pay Manzon these benefits as reduced by Deloitte & Touche's determination under section 4(d) of the Employment Agreement. Defendant contends that Manzon cannot reject Deloitte & Touche's determination unless it was made in bad faith, which, according to Defendant, it was not. Stant's argument misses the mark and, ultimately, demonstrates that Manzon is entitled to summary judgment because Stant failed to

follow the procedures required by section 4(d) of the contract and to pay the severance benefits in a timely manner.

■ As acknowledged by Plaintiff, the contract certainly provides Deloitte & Touche a role to play in determining Stant's severance benefits. Section 4(d) establishes that "[f]or the purposes of this Agreement, the Company's independent auditors shall determine the value of any deferred payments or benefits in accordance with the principles of section 280G of the Tax Code ..." However, contrary to Stant's argument, reliance on Deloitte & Touche's calculations does not satisfy all of its obligations under this section of the contract. The sentence quoted above continues that "... and tax counsel selected by the Company's independent auditors and acceptable to the Company shall determine the deductibility of payments and benefits to which Executive is entitled." Under the language of the contract, as persuasively argued by Manzon, two decision makers—independent auditors *and* tax counsel—must complete their respective tasks before section 4(d) can justify reducing Manzon's severance benefits under section 4(c).

■ Stant's argument in opposition to this interpretation of the Employment Agreement contravenes a number of rules for interpreting contracts governed by the law of this state. Most importantly, this contract, like all other Indiana contracts, must "be read as a whole when trying to ascertain the intent of the parties." *Peoples Bank & Trust Co. v. Price*, 714 N.E.2d 712, 717 (Ind.Ct.App.1999). Instead of abiding by this principle, Defendant bases its argument on the parsing of the last sentence in section 4(d), which states that "[a]ny determination made by the Company's independent auditors or by tax counsel pursuant to this paragraph shall be conclusive and binding on Execu-

tive." Stant contends that "[t]he use of the disjunctive 'or' reveals that Stant was not required to obtain the opinions of both tax counsel and its independent auditors before the opinion of Deloitte & Touche became 'conclusive and binding' on the Executive." Def.'s Resp. at 25. Stant continues that the use of "any," meaning "one or another" demonstrates that both opinions were not required before Manzon became bound by the independent auditor's determination. *Id.*

This argument improperly ignores two other sentences in section 4(d). *Peoples Bank & Trust,* 714 N.E.2d at 717; *see also George Uzelac & Associates, Inc. v. Guzik,* 663 N.E.2d 238, 241 (Ind.Ct.App.1996) ("[W]hen examining a contract it is viewed as a whole, not each item in isolation.") (citation omitted). One part of section 4(d), as also quoted above, states that "[f]or purposes of this Agreement, the Company's independent auditors shall determine the value of any deferred payments or benefits in accordance with the principles of section 280G of the Tax Code, *and* tax counsel … shall determine the deductibility of payments and benefits to which Executive is entitled." (emphasis added). The clear language of this sentence divides the tasks associated with section 280G of the Tax Code between two actors. Independent auditors calculate the value of payments and benefits, and tax counsel determines whether these payments and benefits are deductible. Another sentence in section 4(d), ignored by Defendant's interpretation of the clause, strengthens our interpretation. The Employment Agreement also states that "[t]he Severance Benefit shall be reduced only to the extent required, *in the opinion of such tax counsel,* to prevent such nondeductibility for federal income tax purposes of any part of the remaining Severance Benefits and other payments and benefits to which Executive is entitled." Section 4(d) (emphasis added). In other

words, Manzon's benefits could not be reduced unless tax counsel determined that such deductions were necessary to avoid additional tax liability for Stant. To accept Stant's argument that "any" determination by auditors "or" tax counsel would be binding on Manzon would be to ignore the remainder of section 4(d), which we cannot do. *Peoples Bank & Trust,* 714 N.E.2d at 717; *George Uzelac,* 663 N.E.2d at 241; *The Pantry, Inc. v. Stop–N–Go Foods, Inc.,* 777 F.Supp. 713, 727 (S.D.Ind. 1991) ("each individual statement must be considered in the framework of the entire section") (citation omitted).

■ Stant violates another basic tenet of contract interpretation when it argues that section 4(d) "allow[s] Stant to utilize tax counsel to determine whether the payments it made under the agreement were deductible for its federal income tax returns, but not to require separate approval by a tax attorney before Deloitte & Touche's cut back determination became binding on the executive." Def.'s Resp. at 26. This reading of section 4(d) construes it to mean that Stant can hire a tax attorney to help it file its own tax returns, but that the tax attorney's decisions will have no impact on Manzon's compensation. Defendant offers no explanation as to why Manzon and Stant would enter into an agreement permitting Stant to undertake an action that would have no effect on Manzon. Such an understanding of the contract runs counter to the practice of refusing to import ambiguity into a contract "merely because controversy exists between the parties concerning the proper interpretation of the terms." *Blume v. Stewart,* 715 N.E.2d 913, 915 (Ind.Ct.App. 1999).

■ Another of Defendant's arguments for its position that tax counsel was not required to assist in the section 280G determination is likewise unavailing. In

an attempt to convince the Court that the contract permits Stant's sole reliance on the opinion of Deloitte & Touche, Defendant offers evidence that fourteen other executives who signed similar agreements and whose employment was terminated under similar circumstances did not require the retention of a separate tax attorney to approve Deloitte & Touche's work. Def.'s Resp. at 26: Harris Aff. ¶¶ 5–9; Margetts Aff. ¶¶ 5–7. Defendant also submits that the use of outside tax counsel is rarely used to check independent auditors' determinations in the relevant business community. Def.'s Resp. at 26; Wilson Dep. at 40. Contrary to Defendant's suggestion, however, this information does not contribute to the analysis of the Employment Agreement. In the absence of ambiguity, as is the case here, courts do not "view extrinsic evidence, but will instead apply the contractual provisions." *George Uzelac,* 663 N.E.2d at 240 (citation omitted).[6]

Defendant's final argument that it complied with section 4(d) and that this compliance defeats Manzon's breach of contract claim relies on its hiring of Raymond Malone, of Baker & Hostetler, LLP, in February of 2001. This contention is a classic example of too little, too late. Stant cannot rely on Malone's approval of Deloitte & Touche's determination because Malone's approval of the independent au-

ditor's work is qualified at best. For instance, section 280G of the Tax Code prohibits deductions for excess parachute payments and defines "parachute payment" as "payment in the nature of compensation to ... [an] individual if such payment is contingent on a change in the ownership or effective control of the corporation." 26 U.S.C. § 280G(b)(2)(A)(i). Deloitte & Touche did not determine whether Manzon's termination was contingent on a change of control, but rather relied on Stant's representation to that effect. Kah Dep. at 111–12. However, Malone opined that a threshold issue in any 280G analysis is whether payment to the individual was in fact contingent on a change of control.[7] Malone Dep. at 53–54. Such second-guessing is hardly the stamp of approval from tax counsel required by section 4(d) of the contract.

Indeed, it is the very fact of "second"—guessing that prevents Stant from successfully claiming that hiring Malone satisfied its obligations under the Employment Agreement. Section 4(d) of the contract mandated that the two processes for determining whether a reduction in Manzon's severance benefits occur nearly simultaneously, but also separately. Independent auditors were to "determine the value of any deferred payments or benefits" and tax counsel was to "determine the deductibility of payments and benefits." Ex. 40,

---

**6.** We also note the limited persuasive value of the other executives' decisions not to pursue enforcement of the language of the contract. They may have placed more trust in Stant or in the work of independent auditors (a decision they may regret now in light of recent Arthur Andersen scandals shaking the consulting and accounting professions). It is also possible that the other executives were sufficiently satisfied with their severance packages that they simply decided to avoid the stress and expense of litigation.

**7.** Whether the termination of Manzon's employment was contingent on a change of con-

trol should have been an important avenue of inquiry when determining his severance benefits. The effective date of termination was May 31, 1999, but the last change in control of ownership at Stant was on May 9, 1997 when Tomkins purchased Stant. Under the Internal Revenue Service's proposed regulations for enforcing section 280G of the Tax Code, payments made after one year following the date of change in ownership or control are "presumed *not* to be materially related to the change in ownership or control." Prop. Reg. § 1.280G–1, Q & A–22(b) (emphasis added).

§ 4(d). Each actor had a job to perform consistent with its own sphere of professional responsibility. It is not enough that Malone half-heartedly approved a determination made two years earlier by the independent auditors.

■ Furthermore, Stant retained Malone's services far too late to fulfill its obligations under the contract. As explained in the discussion of section 4(c) above, for certain benefits, the contract clearly requires payments to have been made "within five (5) business days after the Termination Date," meaning that Manzon should have received his benefits by June 7, 1999. Defendant pays little attention to this issue in its summary judgment briefs, but this aspect of the contract is no empty promise. In Indiana, "time is of the essence of a contract, and the performance, at the time fixed or prescribed, of the conditions or stipulations therein by the contracting party upon whom such duty rests, is indispensable ..." *Ohio Valley Buggy Co. v. Anderson Forging Co.*, 168 Ind. 593, 81 N.E. 574, 577 (1907). Section 4 of the contract sets forth two requirements relevant to our analysis: (1) that certain payments under section 4(c) be paid by June 7, 1999 and (2) that these payments be reduced for purposes of section 280G of the Tax Code *if tax counsel determines that such reduction is necessary*. In order for both obligations to be fulfilled, Stant should have sought the opinion of tax counsel long before February of 2001 when Malone was hired.

Stant's only theory of the case in support of its own motion for summary judgment was that its offer to pay Plaintiff the amounts calculated in good faith by its independent auditors satisfied its obligations under the contract. Because we find as a matter of law, for the reasons explained above, that section 4(d) of the Employment Agreement also required tax counsel to determine whether reductions were required pursuant to section 280G of the Tax Code, Stant is not entitled to summary judgment.

To the contrary, our analysis demonstrates that, on this basis, Plaintiff is entitled to a determination that Stant breached the contract. We must, however, address one last argument from Defendant in its effort to negate this conclusion.

### Section 5(b) General Release

■ Section 5(b) of the Employment Agreement provides that "[i]n consideration for the amounts and benefits due [Manzon] under Section 4 above, and as a condition of receiving any such amounts or benefits, [Manzon] shall ... deliver to the Company a general release (the "General Release")." Ex. 40, § 5(b). According to the contract, the General Release shall release Stant and various individuals associated with Stant from any liability arising out of or relating in any way to Manzon's employment. *Id.* On the basis of section 5(b), Stant argues that Manzon is not entitled to a determination that Stant has breached the Employment Agreement as a matter of law. Def.'s Resp. at 1–2. Specifically, Stant contends that section 5(b) requires Manzon to sign the General Release as a condition precedent to receiving any benefits from Stant. Because Manzon has not signed the General Release, so the argument goes, he is not yet eligible to receive the benefits set forth in the Employment Agreement, and, therefore, Stant cannot be shown to have breached the Employment Agreement by its failure to pay the benefits.

■ While superficially appealing, this argument is ultimately without merit. As correctly set forth by Defendant, "[a] condition precedent is ... a condition which must be fulfilled before the duty to perform an existing contract arises." *Bar-*

*rington Management Co., Inc. v. Paul E. Draper Family, Ltd.,* 695 N.E.2d 135, 141 (Ind.Ct.App.1998). However, it is also the law in Indiana that "a party may not rely on the failure of a condition precedent to excuse performance when that party's action or inaction caused the condition to be unfulfilled." *Hamlin v. Steward,* 622 N.E.2d 535, 540 (Ind.Ct.App.1993). Manzon persuasively argues that Stant's actions prevented him from signing the General Release intended by the contract, thereby causing the failure of the condition precedent. In its argument on this point, Stant quotes only selectively from the Employment Agreement. Stant excludes the conclusion of section 5(b), which states that "the General Release shall not release the Company from any of its obligations *under this Agreement.*" Ex. 40, § 5(b) (emphasis added). Following Manzon's termination, on May 10, 1999, Wiggins sent Manzon the letter referred to above in the discussion of benefits under section 4(c). Ex. 14. The letter purported to confirm the terms of their agreement regarding the termination of Manzon's employment. *Id.* at 1. Rather than including a general release limited in its extent to the terms set forth in section 5(b) of the Employment Agreement, the letter stated that acceptance of its terms would "discharge all obligations Stant may now or in the future have to you *under the Employment Agreement . . .* " *Id.* (emphasis added). Because of the expansion of its expectations regarding a general release beyond the extent set forth in the Employment Agreement, Stant cannot now rely upon the condition precedent to excuse its performance of the contract. Defendant fails to establish a genuine issue of material fact on the basis of this argument that it did not breach the contract. Manzon is entitled to partial summary judgment.

**Section 6 Attorney Fees**

Plaintiff's Motion for Partial Summary Judgment also seeks a determination that Defendant is liable for payment of Manzon's attorney fees and costs in this case. Section 6 of the Employment Agreement provides that:

> In any dispute or controversy arising under this Agreement following a Change of Control, the Company agrees to pay the reasonable fees and expenses of one legal counsel for Executive; *provided, however,* that Executive acts in good faith and in the reasonable belief of the merit of Executive's position.

Ex. 40, § 6. Defendant's response to Manzon's demand is that "[i]t is contrary to Indiana public policy . . . to allow recovery of attorney's fees by a non-prevailing party." Def.'s Resp. at 27. Because the effect of our rulings today is that Plaintiff has prevailed, at least with respect to liability, we conclude that Manzon is entitled to attorney fees, pursuant to Section 6 of the Employment Agreement. The reasonableness of submitted fees and expenses can be determined in conjunction with the damages phase of this litigation.

### Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment is *DENIED* and Plaintiff's Motion for Partial Summary Judgment is *GRANTED.*