Sammy GRECO, Appellant–
Defendant/Counterplaintiff,

v.

KMA AUTO EXCHANGE, INC., Appellee–Plaintiff/Counterdefendant.

No. 34A02–0012–CV–754.

Court of Appeals of Indiana.

Jan. 16, 2002.

Publication Ordered March 1, 2002.

Kristin E. Erato, UAW Legal Services Plan, Kokomo, IN, Attorney for Appellant.

William C. Menges, Jr., Kokomo, IN, Attorney for Appellee.

## OPINION

BROOK, Judge.

### Case Summary

Appellant-defendant/counterplaintiff Sammy Greco ("Greco") appeals the trial court's judgment for $11,783.53 in favor of appellee-plaintiff/counterdefendant KMA

Auto Exchange, Inc. ("KMA") on KMA's claim against Greco and on his counterclaim for conversion. We affirm in part and reverse and remand in part.

### Issues

Greco raises four issues for our review, which we consolidate and restate as the following three:

I.  whether the trial court properly admitted the Motor Vehicle Installment Sale Contract and Security Agreement ("the security agreement") into evidence;

II.  whether the trial court properly awarded attorney's fees to KMA; and

III.  whether the trial court properly found that Greco was not entitled to judgment on his counterclaim of conversion.

### Facts and Procedural History

On December 16, 1995, Greco and KMA entered into an agreement in which KMA agreed to sell Greco a 1987 Dodge pickup truck and Greco agreed to pay a down payment of $1000.00 and finance the remaining balance with NBD Bank ("NBD"). This agreement consisted of two contracts. The first, the security agreement, is on NBD letterhead and bears the following language on the first page:

> This [security agreement] covers your purchase of the motor vehicle described below. In this [security agreement], "Buyer", "you" and "your" refer to each and all of the persons who sign below. "We," "us" and "our" refer to the Seller or anyone to whom the Seller transfers this Agreement. By signing below, you promise to pay us the amount financed plus fixed interest computed on the unpaid balance at the ANNUAL PERCENTAGE RATE . . . .

This page lists the amount financed, the finance charges, the annual percentage rate, the total payments, and the total purchase price, which references the down payment. The first page also contains a payment schedule, a description of the truck, and all additional fees and requirements related to financing.

The second page of the security agreement includes an itemization of the amount financed, which specifically excludes the down payment, a cosigner's guarantee, and an assignment clause stating, "The Seller accepts this [security agreement] and assigns this [security agreement] to NBD Bank . . . ." The assignment clause further provides, "The Seller has assigned this [security agreement] to [NBD]. You must make all future payments to [NBD] . . . ." Bob Shoemaker, a KMA salesperson, signed the assignment clause, and this page also contained Greco's signature.

The third page of the security agreement contains provisions regarding early or late payment of the loan, ownership and protection of the collateral, and default and remedies on default as follows:

> **DEFAULT.** You will be in default:
>
> If you fail to make any payment when due.
>
> If you break any promise under this or any other agreement with us.
>
> If you gave us false or misleading information on your loan application.
>
> . . . .
>
> **REMEDIES ON DEFAULT.** If you are in default the entire balance of your loan is due immediately. We will have all rights and remedies of a secured creditor, holder, or as otherwise provided by law or this [security agreement], without relief from valuation and appraisement laws.
>
> You agree that we may sue you in the city and county where we have our main

office. You agree to pay our attorney's fees and any other costs for collection or enforcement of this [security agreement].

You must deliver the collateral to us if we direct. With or without demanding delivery from you, we will have the right to take possession of the collateral. We may sell it at any location convenient to us and apply the proceeds to payment of our expenses and your loan.

Finally, the third page of the security agreement states, "If we transfer this [security agreement] to another creditor, that creditor will have all of our rights."

The second contract signed by Greco and KMA is a used vehicle order ("the order"), which provides the year, make, model, stock number, odometer reading, sales price, tax, filing fees, down payment due on delivery, and financing arrangements. The order also provides: "I have read the face and back of this order, and **agree** to this purchase contract." Finally, the conditions on the back of the order list the various obligations of Greco and KMA including the following:

8. If full payment for purchased used car is not made within (5) days after notification that same is ready for delivery, dealer may cancel this order and it is agreed that the advance deposit or proceeds of sale of used car taken in trade as the case may be, may be retained by dealer up to twenty percent of the sales price of purchase [sic] used car ordered, or if used car has not been disposed of, dealer shall have a lien thereon for such amount. Such retention of fund or lien shall constitute liquidated damages for purchaser's failure to complete full payment. Dealer may, at its option, return such funds or used car and hold purchaser liable for dealer's loss or damage by reason of purchaser's failure to complete such payment within five (5) days mentioned herein.

. . . .

10. This order shall not constitute a contract until accepted in writing by dealer or his authorized representative and when so accepted is not transferable by purchaser.

Bob Shoemaker, a KMA salesperson, and Greco signed the order on December 16, 1995.

Greco took possession of the truck pursuant to the parties' agreements and returned it the same day complaining of a blown engine. KMA lent Greco another vehicle and attempted to cash his $1000.00 personal check, which was returned for insufficient funds. Unable to settle their differences regarding the engine's repair, Greco returned the "loaner" vehicle and refused to pay the down payment, and KMA refused to allow Greco to remove the truck from its property despite his repeated demands. Throughout the course of the proceedings, Greco made regular payments to NBD and eventually paid the financed portion of the purchase price in full.

On June 11, 1996, KMA filed suit in small claims court alleging that Greco had breached the security agreement by failing to pay the $1000.00 down payment and requested damages in the amount of $3,000.00 plus attorney's fees, interest, and costs pursuant to the terms of the security agreement. On September 12, 1996, Greco answered the complaint and filed three counterclaims, one of which was considered at trial. In that counterclaim, Greco alleged that KMA's continued possession of the truck constituted conversion and requested treble damages, attorney's fees, and costs pursuant Indiana Code Section

34–4–30–1.[1] The small claims court transferred the case to the plenary docket because Greco's counterclaims exceeded its jurisdictional amount.

Greco filed a motion for summary judgment on December 20, 1996, which the trial court denied on June 17, 1997. The trial court certified its judgment for interlocutory appeal, and we affirmed the trial court's denial of summary judgment in an unpublished memorandum decision. *See Greco v. KMA Auto Exch., Inc.,* No. 34A02–9710–CV–717, 699 N.E.2d 334 (Ind. Ct.App.1998).

After a bench trial, the trial court issued the following findings of fact and conclusions thereon:

**FINDINGS OF FACT:**

1. That on December 16, 1995, the parties entered into a written [security agreement] for the sale and purchase of a certain used 1987 Dodge truck. The purchase of the vehicle was "As Is" with no warranty.

2. That pursuant to the terms and conditions of said agreement, [Greco] agreed to pay the sum of one thousand dollars ($1,000) down, and the balance of the purchase price in installments, with interest on the unpaid balance from and after December 16, 1995, until paid, at the annual rate of eleven and twenty-five hundredths percent (11.25%).

3. That [Greco] tendered said down payment by means of personal check, which was deposited by [KMA] in its normal course of business, and was returned for insufficient funds.

4. That the [security agreement] provides that in the event of default, the Seller may take possession of the collateral.

5. That the [security agreement] further provides, "You [the buyer] agree that we [the seller] may sue you in the city and county where we have our main office. You agree to pay our attorney's fees and any other costs for collection or enforcement of this Agreement." [2]

6. That [KMA's] Attorney expended thirty-five (35) hours in connection with this cause, at the trial level, and, in addition, represented [KMA] during the Interlocutory Appeal; and that a reasonable compensation would be one hundred fifty dollars ($150.00) per hour for trial level work, and an additional flat fee of five thousand dollars ($5,000) for the appeal, for a total amount of ten thousand two hundred fifty dollars ($10,-250.00).

7. That any denominated finding herein which is a conclusion of law should be considered as a Conclusion of Law.

**CONCLUSIONS OF LAW:**

1. [Greco] breached his agreement with [KMA] by failing to pay the down payment as agreed.

2. That said breach placed [Greco] in default under the terms and conditions of the [security agreement].

3. That [KMA] was entitled to possession of the truck, pursuant to the terms and conditions of the [security agreement].

---

**1.** This section has been recodified without substantial change as Indiana Code Section 34–24–3–1, and we hereinafter refer to it as such.

**2.** Brackets in quotation in original. We note that in this finding, the trial court added the bracketed "the buyer" and "the seller" to the

language of the security agreement. As mentioned above, the security agreement actually states, "You agree that we may sue you in the city and county where we have our main office. You agree to pay our attorney's fees and any other costs for the collection or enforcement of this Agreement."

4. That [KMA] is entitled to judgment against [Greco] in the sum of one thousand dollars ($1,000), together with pre-judgment interest thereon, at the rate of eleven and twenty-five hundredths percent (11.25%) from December 16, 1995, until the date hereof, in the sum of five hundred thirty-three dollars and fifty-three cents ($533.53); for its attorney's fee in the sum of ten thousand two hundred fifty dollars ($10,-250.00); and for its costs of this action.

5. That [Greco] is entitled to nothing by way of his counter-claim, and [KMA] is entitled to judgment thereon.

6. That any denominated conclusion herein which is a finding of fact should be considered as a Finding of Fact.

On October 13, 2000, Greco filed a motion to correct error, which the trial court denied. Greco then discovered that the trial had not been recorded, and on July 6, 2001, the trial court approved the parties' joint statement of the evidence. Greco now appeals.

### Discussion and Decision

### I. *Admissibility of the Security Agreement*

Greco argues that the trial court improperly admitted the security agreement into evidence because KMA did not present a sufficient foundation that the document was made at or near the time of the transaction pursuant to Indiana Evidence Rule 803(6). Indiana Evidence Rule 803(6) excepts from the hearsay rule certain business records that meet the following criteria:

A memorandum ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity, and if it was the regular practice of that busi-

ness activity to make the memorandum, ... all as shown by the testimony or affidavit of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

"The admission of evidence is a determination entrusted to the discretion of the trial court." *Fowler v. Napier*, 663 N.E.2d 1197, 1200 (Ind.Ct.App.1996). "A trial court abuses its discretion when its action is clearly erroneous and against the logic and effect of the facts and circumstances before it or the reasonable inferences to be drawn therefrom." *Id.*

At trial, Robert Snow ("Snow"), KMA's general manager, testified that he was involved in the sale of the truck and that, while he did not sign the security agreement, he was the keeper of the records and "the document was kept in the ordinary course of business at KMA, ... it was signed during the regular course of its business, as part of its regularly conducted business activity." Because Snow testified that he was involved in the sale of the truck to Greco, a sufficient foundation exists from which the trial court could have concluded that the security agreement was made at or near the time of the transaction. *See, e.g., Williams v. Hittle*, 629 N.E.2d 944, 948 (Ind.Ct.App.1994) (stating that sufficient evidence existed from which the trial court could conclude that the contested expense reports were made at or near the time of the transaction where employees of a beauty parlor met weekly to report their earnings and the weekly earnings were reported monthly to an auditor), *trans. denied.* Therefore, we cannot conclude that the trial court abused its discretion in admitting the security agreement into evidence.

## II.  Attorney's Fees

The standard of review for findings of fact and conclusions thereon "issued pursuant to Indiana Trial Rule 52(A) is one of great deference." *S–Mart v. Sweetwater Coffee Co.*, 744 N.E.2d 580, 585 (Ind.Ct.App.2001), *trans denied*. We engage in a two-tiered review and must "first determine whether the evidence supports the findings and second, whether the findings support the judgment." *Couchman v. Restoration Contractors, Inc.*, 743 N.E.2d 346, 347 (Ind.Ct.App.2001). We will not set aside the trial court's findings and conclusions unless they are clearly erroneous. *See id.* "A judgment is clearly erroneous only if a review of the record leaves the court with a firm conviction that a mistake has been made." *S–Mart*, 744 N.E.2d at 585.

Greco argues that the trial court improperly relied on the security agreement in awarding attorney's fees to KMA because KMA assigned all of its rights to NBD under the security agreement. Greco argues in the alternative that even if KMA had rights under the security agreement, he was not in default because under its terms, he was only obligated to pay (and did in fact pay) the amount financed.

Upon thorough review of the security agreement, we conclude that KMA had no right to recover attorney's fees under its terms because they govern only the financing arrangements, not the down payment.[3] Indeed, the security agreement specifically excludes the down payment in calculating the amount financed in the "Itemization of Amount Financed" and specifically states, "By signing below, you promise to pay us the amount financed plus fixed interest computed on the unpaid balance at the ANNUAL PERCENTAGE RATE ...."[4] Thus, by signing the security agreement, Greco only agreed to pay the amount financed, not the down payment. We are therefore firmly convinced that a mistake has been made, which requires us to reverse the award of attorney's fees to KMA.[5]

## III.  Conversion

KMA argues that we are required to review Greco's counterclaim for conversion under a sufficiency of the evidence standard. We review claims tried to the bench, however, under a clearly erroneous standard. *See Dinsmore v. Lake Elec. Co.* 719 N.E.2d 1282, 1285 (Ind.Ct.App.1999); Ind. Trial Rule 52(A). "A judgment is clearly erroneous when a re-

---

**3.** In fact, it appears that the order, rather than the security agreement, created rights in KMA to the down payment in describing the remedies available to KMA if "full payment" is not timely made. We also note that while the order contains a liquidated damages clause, it does not provide for the award of attorney's fees.

**4.** We agree with Greco's first argument in that, even if KMA did have rights under the security agreement, it assigned those rights to NBD. This conclusion is based on the following clauses:

Seller's Acceptance.  The Seller accepts this Agreement and assigns this Agreement to NBD Bank ....

Notice of Acceptance[.]  The Seller has assigned this Agreement to the Bank identified in the Seller's Acceptance above.

. . . .

If we transfer this [security agreement] to another creditor, that creditor will have all of our rights.

We further note that since the security agreement only governs the financed amount and Greco timely paid that amount in full, he is not in default under the security agreement.

**5.** In the conclusion section of his appellate brief, Greco asks us to vacate the trial court's award of prejudgment interest. Greco, however, does not dispute the trial court's award of the down payment to KMA; thus, we cannot reverse the trial court's award of prejudgment interest thereon.

view of the record leaves us with a firm conviction that a mistake has been made." *Id.*

■ Greco argues that the trial court improperly granted judgment on his counterclaim in KMA's favor because the trial court erroneously concluded "[t]hat [KMA] was entitled to possession of the truck, pursuant to the terms and conditions of the [security agreement]" since KMA had assigned all its rights to NBD. Greco further argues that since he was not in default, the "remedies on default" provision, which might have given a creditor rights in the truck, is inapplicable. In response, KMA contends that it was entitled to possession of the truck pursuant to the security agreement because Greco was in default.

As we concluded above, KMA does not have rights under the security agreement because it governs only the financing arrangements between Greco and NBD; therefore, we are firmly convinced that a mistake was made [6] when the trial court found "[t]hat the [security agreement] provides that in the event of default the Seller may take possession of the collateral." Thus, the trial court's conclusions that KMA was entitled to possession of the truck pursuant to the terms of the security agreement and that Greco "is entitled to nothing by way of his counter-claim, and [KMA] is entitled to judgment thereon" are clearly erroneous. While we conclude that the trial court improperly granted judgment in KMA's favor, we must also determine whether Greco is entitled to judgment on his counterclaim for conversion.

■ Under Indiana Code Section 34–24–3–1, a person who proves the elements of criminal conversion by a preponderance of the evidence can recover up to three times the actual damages, the costs of the action, and reasonable attorney's fees. *See Gilliana v. Paniaguas,* 708 N.E.2d 895, 899 (Ind.Ct.App.1999) (citing IND.CODE § 34–24–3–1), *trans. denied.* This section "allows a person who has suffered a pecuniary loss as a result of a violation of criminal conversion to bring a civil action to recover the loss." *Id.*

Indiana Code Section 35–43–4–3 provides that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion, a Class A misdemeanor." Indiana Code Section 35–4–1–2–2 provides that "(a) A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so. (b) A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." Indiana Code Section 35–43–4–1(a) provides that to " 'exert control over property' means to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property, or to secure, transfer, or extend a right to property." Finally, Indiana Code Section 35–43–4–1(b) provides, "a person's control over property of another person is 'unauthorized' if it is exerted ... without the other person's consent ...."

We have maintained that the mens rea requirement "differentiates criminal conversion from the more innocent breach of contract or failure to pay a debt situation that the criminal conversion statute was not intended to cover." *See Gilliana,* 708 N.E.2d at 899. "The legislature did not intend to criminalize bona fide contract disputes." *NationsCredit Commercial Corp. v. Grauel Enter., Inc.,* 703 N.E.2d 1072, 1078 (Ind.Ct.App.1998), *trans. denied.*

---

**6.** We note that this language tracks the language of the standard of review.

Here, the evidence adduced at trial indicates that after the truck's engine failed, KMA towed the vehicle to its premises and offered to replace the engine at cost. Greco decided to have the engine replaced elsewhere and informed KMA that he wanted to retrieve his truck for that purpose. KMA refused to return the vehicle to Greco unless or until he paid the down payment. Greco then attempted to retrieve the truck from KMA's lot, but other vehicles blocked it in, preventing Greco from removing it. Greco's attorney also testified that he called KMA and informed the person in charge "that they had no right to hold Greco's vehicle and that it must be returned." Two years after the purchase date, KMA had still refused to return the truck. KMA presented no evidence to dispute this testimony.[7]

Based on this evidence, we are convinced that KMA exerted unauthorized control over Greco's property. We further conclude that KMA did so knowingly because neither the security agreement nor the order gave KMA a right to possession of the vehicle. Additionally, Greco's attorney testified that he informed KMA "that they had no right to the truck and that it must be returned[,]" and KMA presented no evidence indicating that it had acted upon a reasonable interpretation of an ambiguous contract or that this was a transaction between sophisticated business entities. *See Gilliana,* 708 N.E.2d at 900 (considering these factors in determining whether the requisite mens rea was present in a claim of civil conversion). In fact, the security agreement governed the financing arrangements and unambiguously assigned any rights that KMA might have had to NBD. Further, nothing in the rec-

ord even intimates that Greco was a sophisticated business entity.

Thus, Greco established the elements of criminal conversion by a preponderance of the evidence. We therefore reverse the trial court's judgment on the counterclaim and remand to the trial court to amend its findings and conclusions in accordance with this opinion and to calculate Greco's damages under Indiana Code Section 34–24–3–1.

Affirmed in part and reversed and remanded in part.

RILEY and MATHIAS, JJ., concur.

### ORDER

This Court having heretofore handed down its opinion in this cause marked Memorandum Decision, Not for Publication;

Comes now the Appellant, by counsel, and files herein Motion to Publish, alleging therein that said opinion establishes, modifies or clarifies a rule of law in that there are very few reported decisions concerning the rights of parties after a contract has been assigned and what constitutes default of contract provisions which is a factual issue of unique interest or substantial public importance and prays the Court to order the decision in this appeal to be published;

The Court having examined said Motion and being duly advised, now finds that the same should be granted and that this Court's opinion heretofore handed down in this appeal as a Memorandum Decision should now be ordered published.

---

**7.** In its brief, KMA states that "Snow testified that Greco had not been denied permission to remove the truck from KMA's property." We note, however, that the agreed statement of the evidence indicates that this statement was ordered stricken from the record because KMA had failed to respond to discovery requests, and thus Greco's earlier requests for admissions had been deemed admitted.

149

IT IS THEREFORE ORDERED that the Appellant's Motion to Publish is granted and this Court's opinion heretofore handed down in this cause on January 16, 2002, marked Memorandum Decision, Not for Publication, in now ordered published.

All Panel Judges concur.