ESTATE OF Gregory J. PENZENIK,
Linda A. Penzenik, Personal Repre-
sentative, Appellants–Plaintiffs,

v.

PENZ PRODUCTS, INC., David Pen-
zenik, and Richard Penzenik,
Appellees–Defendants.

No. 71A05–0304–CV–192.

Court of Appeals of Indiana.

Dec. 31, 2003.

Transfer Denied April 12, 2004.

See also 749 N.E.2d 61.

Charles P. Rice, R. John Kuehn, Boveri
Murphy Rice Ryan & LaDaue, South
Bend, IN, Attorneys for Appellants.

H. Theodore Noell, Mishawaka, IN, John C. Hamilton, The Hamilton Law Firm, South Bend, IN, Attorneys for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

The Estate of Gregory Penzenik ("the Estate") and the Gregory Penzenik Trust ("the Trust") (collectively "the Appellants") appeal the trial court's judgment requiring the Trust to sell its shares of Penz Products, Inc. ("Penz") pursuant to a 1991 Stock Sale and Purchase Agreement ("the Agreement"). The Appellants present several issues for our review, but we address a single dispositive issue, namely, whether the trial court erred when it found that the Trust is required to sell its shares to Penz under the Agreement.

We reverse.[1]

### FACTS AND PROCEDURAL HISTORY

This court has previously addressed the facts underlying the issues presented in this appeal. In a separate action involving the same parties, we explained the facts and procedural history as follows:

Penz is a closely held corporation owned by members of the Penzenik family. In 1991, the shareholders executed the Agreement, which purported to require the sale of all shares back to Penz upon a shareholder's death.

By 1998, Penz was owned entirely by three brothers, David, Richard, and Gregory. On July 25, 1998, Gregory died. Gregory's widow, Linda, opened his estate in August 1998 and issued the

first notice to creditors on September 3, 1998. On December 4, 1998, Penz filed a document in the Estate proceedings styled "Appearance of Interested Party" (Appearance), which stated:

"Comes now [Penz] and enters [its] appearance in this estate and request[s] that [Penz's counsel] be served and/or provided with copies of all further pleadings and notices of all further hearings in this estate. This request is made because [Penz] possess[es] certain vested rights and obligations under Stockholder By–Sell [sic] Agreements and/or other agreements to which the decedent was a party.

The intangible property, pending execution of the aforesaid Buy Sell Agreements appears to be a present conditional asset of the estate which [Penz] ha[s] requested to repurchase in conformity with the prior agreements."

On January 19, 1999, Penz served the Estate with a formal demand that it comply with the terms of the Agreement and sell Gregory's shares of Penz to Penz. After protracted negotiations, the parties were unable to reach an agreement as to the appropriate price for the shares. Accordingly, on April 5, 1999, Penz filed a "Petition to Enforce Compliance with Buy–Sell Agreement," requesting that the trial court order the Estate to sell the shares.

After a trial at which the proper interpretation of the Agreement was hotly contested, the court found that the Estate was required to sell the shares to Penz. The Estate now appeals.

---

1. We heard oral argument on November 17, 2003, at the Indiana University School of Law in Bloomington.

*Estate of Penzenik v. Penz Products, Inc.*, 749 N.E.2d 61, 62–63 (Ind.Ct.App.2001) ("*Penzenik I* ").

In *Penzenik I*, the Estate raised several issues on appeal, but we addressed a single dispositive issue, namely, whether Penz's petition for specific performance was timely filed under Indiana Code Section 29–1–14–21. We noted that under that statute, such a petition must be filed within five months of the date of the estate's first published notice to creditors. And we held that Penz's petition was not timely filed. But we also stated that "[u]nlike the general claim statute, under which an untimely claim is forever barred, the consequence of a failure to file a timely claim under IC 29–1–14–21 is that the claimant must proceed against the distributees, rather than the estate." *Penzenik I*, 749 N.E.2d at 64–65.[2]

While *Penzenik I* was pending in the trial court, the Estate filed a complaint against Penz for breach of fiduciary duty and minority shareholder oppression. Penz answered and filed a counterclaim seeking specific performance and declaratory relief. Then, following our decision in *Penzenik I*, Penz moved the trial court for leave to file an amended counterclaim adding "parties unknown who are either trustees ... [of the Trust or] its beneficiaries." Thereafter, Penz moved the trial court for leave to file a second amended counterclaim adding the Trust and its trustees as counterdefendants. The trial court granted that motion. Penz's second amended counterclaim consisted of counts for: (1) specific performance; (2) declaratory relief; and (3) pursuit of frivolous claims in bad faith.

The Appellants moved to dismiss Penz's second amended counterclaim, but the trial court denied that motion. The Appellants then asked the trial court to reconsider its motion to dismiss in light of this court's opinion in *F.B.I. Farms, Inc. v. Moore*, 769 N.E.2d 688 (Ind.Ct.App.2002), *vacated by* 798 N.E.2d 440 (Ind.2003). But the trial court denied the motion to reconsider. The Appellants then filed their answer to Penz's second amended counterclaim.

Following a hearing, the trial court entered a "case management order re[:] bifurcated trial[,]" which provided in relevant part that the court would "try separately Counts I and II of the Defendants and Counterclaimants Second Amended Counterclaim ..., deferring trial on the Estate's complaint and Count III of the Counterclaim[.]" The order also stated in relevant part as follows:

1. The trial shall resolve all issues raised in Counts I and II of the Counterclaim and the answer thereto by the [Estate], [the Trust] and Brandon Penzenik.

2. The evidence to be considered by the Court consists of the following:

(a) the record of proceedings submitted to the Court of Appeals in [*Penzenik I* ], which has been lodged with the Court;

(b) the Estate and [the] Trust's responses to Defendants and Counterclaimants' First Set of Requests for Admission and Second Set of Interrogatories insofar as they relate to Counts I and II of the Counterclaim;

(c) stipulations which the parties may agree to;

(d) to the extent the parties are unable to stipulate as to facts either side claims are relevant to these proceedings, the Court shall make available no more than

---

**2.** On August 27, 2001, the Estate instructed Penz to issue a portion of Gregory Penzenik's shares to the Trust. By letter dated August 31, 2001, Penz transferred 143 shares to the Trust and reissued the balance to the Estate.

two hours within which to receive any evidence by way of live testimony or exhibit, or both.

On March 5, 2003, the trial court issued findings and conclusions and entered judgment in favor of Penz. The trial court ordered the Trust to sell Penz "all shares in Penz Products, Inc. previously owned by decedent Gregory Penzenik and now held by [the Trust.]" This appeal ensued.

## DISCUSSION AND DECISION

In *Peoples Bank & Trust, Co. v. Price,* 714 N.E.2d 712, 716–17 (Ind.Ct.App.1999), *trans. denied,* this court set out the applicable standard of review as follows:

> Construction of the terms of a written contract is a pure question of law for the court; thus, our standard of review is de novo. The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts. If the language of the instrument is unambiguous, the intent of the parties is determined from the four corners of that instrument. If, however, a contract is ambiguous or uncertain, its meaning is to be determined by extrinsic evidence and its construction is a matter for the fact finder.

> In interpreting a written contract, the court should attempt to determine the intent of the parties at the time the contract was made as discovered by the language used to express their rights and duties. The contract is to be read as a whole when trying to ascertain the intent of the parties. The court will make all attempts to construe the language in a contract so as not to render any words, phrases, or terms ineffective or meaningless. The court must accept an interpretation of the contract which harmonizes its provisions as opposed to one which causes the provisions to be conflicting. Moreover, in the absence of

anything to indicate a contrary intention, writings executed at the same time and relating to the same transaction or subject matter will, as a general proposition, be construed together.

> Parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence. The existence of express terms in a valid written contract precludes the substitution of any implied terms regarding the subject matter covered by the express terms. This principle is especially true in Indiana because our courts will zealously defend the freedom to contract.

(Citations omitted).

In this case, the Appellants make several different arguments in support of their contention that the Trust is not required to sell its shares to Penz under the Agreement. But we address a single dispositive issue the Appellants raise, namely, whether the Agreement applies to the transfer of shares by will. We conclude that it does not.

■ Initially, we note that Penz asserted for the first time at oral argument that the Appellants' claims are barred by the doctrines of res judicata and law of the case. Specifically, Penz interprets our holding in *Penzenik I* to mean that we have already decided that Penz can maintain a claim against the Trust under the terms of the Agreement. We cannot agree. In *Penzenik I,* we merely observed that Indiana Code Section 29–1–14–21 did not bar Penz's *efforts* to enforce the Agreement by seeking recourse against the distributees. *Penzenik I,* 749 N.E.2d at 65. We expressly stated that we were addressing only a single issue in *Penzenik*

*I,* namely, whether Penz's petition for specific performance was timely filed.

■ The Agreement is entitled "Stock Sale and Purchase Agreement." Following a short list of recitals,[3] the first substantive paragraph, entitled "Restriction on Sale of Stock," reads as follows:

> So long as this Agreement shall remain in force and effect no Stockholder shall transfer or in any way encumber his shares of stock in the Corporation to any person, firm or corporation *except by Will or gift* without the consent of all other Shareholders and of the Corporation, other than as hereinafter provided.

(Emphasis added). Appellants maintain that the plain meaning of the language in that paragraph indicates that "a Shareholder can transfer shares outside the bounds of the Agreement" by will, by gift, or with the consent of all other Shareholders. Penz counters that the Agreement expressly creates a right for Penz "to purchase stock from any deceased shareholder[,]" whether the stock passes by intestate succession or by will.[4]

3. The recitals read in relevant part as follows:
   > WHEREAS, the parties believe it is in the best interests of the Corporation and the Shareholders to make provision for the future disposition of shares of the Corporation, and
   > WHEREAS, in the event of the death, total permanent disability or retirement of any Shareholder of the Corporation, it will be to the best interests of the Corporation and of Shareholders' successors that the Corporation have the first right of refusal to acquire all shares of stock owned by such Shareholder, . . . .

   As Penz correctly points out, "recitals are worthy of consideration only when 'the intention of the parties is not clear from the operative portion of the contract[.]' " (Quoting *Stech v. Panel Mart, Inc.,* 434 N.E.2d 97, 100 (Ind.Ct.App.1982)).

4. The parties dispute whether the Agreement creates an option to purchase or a right of first refusal. But we need not resolve that

■ Our supreme court recently addressed the general principles governing restrictions on stock transfers in *F.B.I. Farms, Inc. v. Moore,* 798 N.E.2d 440 (Ind.2003). The court noted that Indiana Code Section 23–1–26–8 authorizes restrictions on the transfer of shares based on the theory that owners of a corporation should be permitted to control its ownership and management and "prevent outsiders from inserting themselves into the operations of the corporation." *Id.* at 445. And the court stated that "[a]part from any statutory requirements, restrictions on transfer [of stock] are to be read, like any other contract, to further the manifest intention of the parties." *Id.* at 445–46. Moreover, "[b]ecause they are restrictions on alienation and therefore disfavored, the terms in the restrictions are not to be expanded beyond their plain and ordinary meaning." *Id.* at 446.

In *F.B.I. Farms,* our supreme court observed that the transfer restrictions at issue in that case [5] "seem[ed] to contemplate

issue, because it has no bearing on whether the Agreement applies to transfers by will.

5. In *F.B.I. Farms,* a family-owned corporation adopted restrictions on the transfer of shares which required *all* transfers to be approved by the Board of Directors and which established a right of first refusal. Linda Burger, a family member and shareholder, married Birchell Moore. When Linda divorced Moore in 1982, the court awarded her all of her shares in F.B.I., and the court awarded Moore a monetary judgment secured by a lien on Linda's shares.

   When Moore subsequently sought a writ of execution on his lien, F.B.I. demanded payment of the subscription price for Linda's shares. After Moore obtained the writ of execution, F.B.I. purported to cancel the shares for failure to pay the subscription price. Following a sheriff's sale, Moore purchased all of the shares in F.B.I. owned by Linda. Moore then filed suit against F.B.I. seeking a declaratory judgment that the shares at issue were

restricting all transfers, voluntary and involuntary, by providing that no stock of the corporation should be 'transferred, assigned, exchanged, divided, or sold' without complying with the restrictions." *Id.* at 449. And the court held, "[t]he intent of the parties is thus rather plain: to restrict ownership to the designated group, and to preclude transfer *by any means.*" *Id.* (Emphasis added). Finally, the court held that "[i]f the language [of an agreement restricting stock transfers] purports to bar all transfers, and by its terms would apply to intestacy, devise or any other means of transfer, it should be given effect unless the restriction violates some policy." *Id.*

By contrast, here, the plain and ordinary meaning of the unambiguous terms of the Agreement indicates that the parties intended to exclude transfers by will or gift from the transfer restrictions. Unlike the share transfer restrictions in *F.B.I. Farms,* the restrictions under the Agreement here do not apply to *all* transfers of stock. Rather, the plain language states that the Agreement restricts the transfer or encumbrance of each shareholders' stock *"except by Will or gift."* (Emphasis added).

The first substantive paragraph of the Agreement *could* have been drafted to read as follows:

> So long as this Agreement shall remain in force and effect no Stockholder shall transfer or in any way encumber his shares of stock in the Corporation to any person, firm or corporation without the consent of all other Shareholders and of the Corporation, other than as hereinafter provided.

In that case, the restrictions would have applied to *all* transfers of stock made "without consent of all other Shareholders and of the Corporation[.]" However, as written, the restrictions apply to all transfers *"except by Will or gift."* Again, we cannot ignore that plain language.

Further, the Agreement makes a fundamental distinction between inter vivos and testamentary gifts on the one hand and transfers for consideration on the other. Following the categorical exception of transfers "by Will or gift," Section I of the Agreement restricts the "sale and purchase" of stock during a shareholder's lifetime, and Section II restricts the "purchase and sale" of stock upon a shareholder's permanent disability or death. Section II would have applied here if, for example, Gregory had died intestate or had failed to dispose of the shares in his will. But neither Section I nor Section II, nor any other subsequent provision of the Agreement, mentions disposition of stock by will or gift. No provision purports to nullify the exception of transfers by will or gift. The Agreement must be construed as a whole, giving effect to all of its provisions. To hold otherwise would render the "Will or gift" exception meaningless. *See Peoples Bank,* 714 N.E.2d at 717.

Additional support for our reading of the Agreement is found in Section II B, which provides in relevant part that Penz "shall have the right ... to purchase from a deceased ... Stockholder's *Personal Representative* ... all of the shares of the Corporation owned by the decedent[.]" (Emphasis added). There is no provision giving Penz the right to purchase a decedent's shares from a devisee.[6] Penz main-

---

unencumbered by restrictions and were freely transferable.

**6.** Even if a transfer by will were not exempt from the Agreement, it is clear from the text

that the option to purchase would have to be presented as a claim to the personal representative.

tains that because the Agreement is expressly binding on heirs, successors, and assigns of the shareholders, the Trust is obliged to sell its shares to Penz under Section II B. But the plain language of Section II B does not support that contention because Gregory's transfer of his shares to the Trust under the residuary clause of his will was exempt altogether from the Agreement.

In sum, while the Agreement might have been better drafted, its various provisions can be harmonized, and when the Agreement is read as a whole it is unambiguous. *See id.* As such, we ascertain the intent of the parties from the four corners of the Agreement. *See id.* at 716. The plain and ordinary meaning of the terms of the Agreement indicates that a shareholder's transfer of shares by will or gift is unrestricted. This was the intention of the parties as expressed by the words "except by Will or gift." Penz could have written the Agreement such that *all* stock transfers were subject to restrictions, which is permissible under our supreme court's opinion in *F.B.I. Farms,* but, again, it chose not to do so. We hold that the trial court erred when it found that the Trust is required to sell its shares to Penz under the Agreement.

Reversed.

BAILEY, J., concurs.

ROBB, J., dissents with separate opinion.

ROBB, Judge, dissenting.

I respectfully dissent. The Restriction paragraph reads:

So long as this Agreement shall remain in force and effect no Stockholder shall transfer or in any way encumber his shares of stock in the Corporation to any person, firm or corporation except by Will or gift without the consent of all other Shareholders and of the Corporation, other than as hereinafter provided.

The majority states that the only reading which gives meaning to the "except by Will or gift" phrase is to read that all testamentary and gift transfers are excepted from the restrictions which follow. I do not agree. The majority's interpretation of the paragraph seems to give no significance to the phrase "other than as hereinafter provided." The majority reads the following sections to apply only in the event of the sale of a shareholder's shares, in the event of a shareholder dying intestate, or in the event that a shareholder fails to dispose of his shares in his will. But the Agreement does not make a distinction between a testamentary gift and a shareholder dying intestate.

The trial court considered the interpretation put forth by the majority and rejected it, instead reading the paragraph to signify that the only way in which a shareholder may transfer his shares of stock to any person or in any way encumber his shares without the consent of all other shareholders is by will or gift and subject to the restrictions which follow.

Following the trial court's interpretation, Section I below the Restriction paragraph sets forth the parameters for the sale of stock to a third party. Section II then sets forth the parameters for the transfer of stock upon the death of a shareholder. These two sections are alike in that they grant to Penz similar rights in the event a shareholder attempts to transfer stock. Both paragraphs grant Penz the right to preclude a transfer the shareholder desires to make by standing in the shoes of the would-be buyer or devisee, provided Penz makes payment of an amount fixed by the terms of the Agreement. Under Section I, Penz may elect not to accept the shareholder's offer that Penz purchase the shareholder's stock and

allow the shareholder's sale to a third person to go forward. Similarly, under Section II, Penz may elect not to demand the sale of the decedent's stock to Penz and instead allow the testamentary disposition set forth in the shareholder's will to go forward.

The trial court's interpretation of the Agreement is in keeping with the philosophy of *F.B.I. Farms* that restrictions in closely held corporations are permissible provided they do not violate any policy. The majority's interpretation would allow shareholders to create wills or to make inter vivos gifts to dispose of their stock as they wished. However, the Agreement represents the desire of the members of a close-knit family corporation to determine to whom shares are sold, transferred, or devised. By following the majority's interpretation, a shareholder could evade the restrictions of the Agreement by transferring stock through testamentary transfer or inter vivos gift. I do not believe that such an interpretation fits with a reading of the entire Agreement or with our supreme court's decision in *F.B.I. Farms*.

I agree with the majority that the first substantive paragraph of the Agreement could have been written more clearly so that we could easily ascertain the intentions of the parties. However, we are attempting to interpret the Agreement as it sits in front of us. Even though the Agreement could have been written differently, I still believe that the majority's reading does not take into consideration the phrase "other than as hereinafter provided."

Thus, I would affirm the trial court's interpretation of the Agreement. Although the majority does not reach the issue, I would also affirm the trial court's determination that the Estate and Trust were obligated by the Agreement to honor the demand by Penz to sell to Penz the 360 shares of stock owned by Gregory Penzenik at the time of his death for the total book value of the shares.

Additionally, I do not agree with the majority's determination that this court's holding in *Penzenik I* did not signify that Penz could maintain a claim against the Trust under the terms of the Agreement. In *Penzenik I*, this court stated:

> Because Penz filed its petition outside the statutory time limit for bringing claims, it was untimely, and the trial court erred in trying the matter. Our decision today, however, does not foreclose Penz's claim completely. Unlike the general claim statute, under which an untimely claim is forever barred, the consequence of a failure to file a timely claim under IC 29–1–14–21 is that the claimant must proceed against the distributes, rather than the estate. Thus, Penz's failure to comply with IC 29–1–14–21 does not bar its efforts to enforce the Agreement, but rather, requires it to seek recourse against the distributees.

*Penzenik I*, 749 N.E.2d at 64–65 (citation omitted). When an opinion forecloses one option for litigation, but leaves another option open, the parties understandably rely on that language to mean that subsequent litigation may be brought. The majority's opinion encourages people to disregard directives in opinions, thus spurring on litigation. The majority seems to suggest that the language in *Penzenik I* was mere dicta. I believe that the language was directive and should not be contradicted by today's opinion.

I do not assert that the language in *Penzenik I* entitles Penz to an instant judgment based on res judicata because I recognize that the issues presented today were not resolved in *Penzenik I*. However, I feel that anything we write in an opinion—whether dicta or holding—should have some meaning. The majority holds

today that the language was dicta and Penz should not have relied upon it, thereby saying that the language in *Penzenik I* was meaningless. I cannot join in stating that the language was meaningless.

Therefore, I would affirm the decision of the trial court.