James **WHITAKER** and Karl Whitaker, Appellants–Plaintiffs,

v.

Martin C. **BRUNNER**, Appellee–Defendant.

No. 69A01–0402–CV–67.

Court of Appeals of Indiana.

Sept. 3, 2004.

David W. Stone, IV, Stone Law Office & Legal Research, Anderson, Michael L. Rogers, Rogers & Dove, North Vernon, IN, Attorneys for Appellants.

John L. Kellerman, II, Batesville, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

James and Karl Whitaker attempted to purchase an auto parts business from Martin C. Brunner, but the Whitakers failed to perform some of their obligations under the contract. The Whitakers sued Brunner for breach of contract. Brunner counter-sued the Whitakers on the same grounds. Brunner eventually prevailed in his lawsuit. The Whitakers appeal that judgment, presenting the following restated issues for review:

1. Did the trial court err in concluding that the Whitakers breached the contract by allowing the inventory to diminish?

2. Is the amount awarded by the court for breach of contract supported by the evidence?

3. Is the award of treble damages supported by the evidence?

We affirm in part, reverse in part, and remand with instructions.[1]

---

1. Brunner's June 21, 2004, Verified Motion to File Belated Appellee's Appendix is hereby granted.

The facts favorable to the judgment are that Brunner owned Indiana Auto Parts (the Store), a business he operated in Ripley County. On June 23, 2001, Brunner and the Whitakers entered into a contract (the Sales Contract) whereby the Whitakers would purchase the Store. Because it is critical to the resolution of this appeal, we reproduce the Sales Contract below:

This sales contract is a supporting document to the Bill of Sale of Stock issued by Martin C. Brunner, hereafter referred to as "seller" to James Whitaker and Karl Whitaker, herafter [sic] referred to as "buyers" stating condition of sale of the entire parts inventory of Indiana Auto Parts, 704 East Pearl Street, Batesville, Indiana detailed in document # 1 dated _____.

The sale of the entire inventory valued at jobber cost of $344,456.96 is to be sold to "buyers" for the sum of $166,000.00 A $50,000.00 down payment on the inventory is due at the time of this document signing. The balance of $116,000.00 on said inventory is due on or before August _____, 2001 (60 days after this document signing).

The equipment and fixtures of Indiana Auto Parts is hereby agreed to as having a value of $54,000.00. This sale of equipment and fixtures is to take place on the date of settlement of the balance due seller on the afore mentioned [sic] inventory.

"Buyers" will have full use of the entire inventory and fixtures including that portion to be paid for on or before the _____ day of August. The "buyers" do hereby take full responsibility for said inventory and will cause it to be kept in good salable order and condition, and "buyers" will be responsible for the balance due on this contract in the event of fire, theft, an act of God, or any other event.

The compensation to the "seller" for the use of the inventory and fixtures and equipment will be at the rate of $200.00 per week, payable by the last day of the month in which the bill was incurred. If the balance due on the parts inventory is paid before August _____ 2001, the compensation will be prorated to that date and due upon contract completion.

The inventory property taxes due November 10, 2001 and after are the sole responsibility of the "buyers".

From date of sale forward, "seller" has the right to purchase from the business now known as Indiana Auto Parts any products sold by said company at cost, so long as the products are not for resale.

The "seller" agrees to rent to "buyers" the real estate at 704 East Pearl Street, Batesville, Indiana, known as Indiana Auto Parts and Indiana Auto Parts Car Wash both located in the Rothschild parkway addition to the City of Batesville lots 21, 22, 23, and 24, beginning June _____, 2001 at a rate of $500.00 per week payable at the first of each month for that month. "Buyers" hereby guarantee to "Seller" that they will not devalue said real estate, will not make major renovations, or changes to the ... [sic] with an insurance certificate to demonstrate business liability on said premises. "Seller" retains the right to store equipment and personal property, now there, on the premises until real estate is sold.

James Whitaker and Karl Whitaker agree to purchase above described real estate from Martin C. Brunner for the price of $350,000.00. Said purchase shall be either a land contract with Mar-

tin C. Brunner, with 30% down, or a purchase using private lending institution or outside buyer. Said sale to be completed by 12/31/01.

*Appellant's Appendix* at 8–9. The Bill of Sale referred to in the first paragraph of the above Sales Contract provided as follows:

I, Martin C. Brunner have this 23rd day of June 2001 sold to James Whitaker and Karl Whitaker the entire parts inventory of Indiana Auto Parts, an automotive parts jobber, wholesaler and retailer located at 704 East Pearl Street, Batesville, Indiana. The jobber cost blue sheet value of this inventory is $344,456.96. This figure is supported by a recent inventory and is available for physical verification by legitimate interested parties anytime during business hours.

I, Martin C. Brunner hereby certify that I wholly own this stock, and that it is free and clear of any leins [sic], loans or encumbrances.

*Id.* at 10.

Pursuant to the terms of the Sales Contract, the Whitakers paid $50,000 to Brunner on June 23. The balance of the purchase price was due sixty days hence. On August 23, James Whitaker telephoned Brunner and told him they (the Whitakers) would not be able to meet the original balance payment deadline and asked for more time. Brunner extended the payment deadline by thirty days, to September 23. On September 23, James informed Brunner that they still did not have the money. On or about that day, Brunner was notified that the Store's insurance policy was being cancelled for nonpayment of the premium. When asked, James claimed that he had already paid the premium. After several weeks of attempting to resolve the insurance issue, Brunner went to the Store on October 12

and asked James to accompany him to the insurer's office to resolve the matter. James refused. Also on October 12, Brunner was advised by the bank through which the Whitakers sought to obtain a loan for the balance due that the Whitakers' application was going to be denied. Brunner had also observed that the inventory in the Store was depleted and not being restocked. Brunner spoke with a lawyer on October 12 about the possibility of obtaining an injunction against the Whitakers because he feared the inventory would be entirely depleted. Upon the lawyer's advice, Brunner went to the Store and asked James for the keys. Brunner described that scene as follows:

I said [to James] the insurance isn't in force and now the money is not coming. I said why don't you give me the keys and when you get the insurance back in force and you get the payments caught up you have until the first (1st) of the year, that's I think what the contract said, uh, come back in. I said I will not open the store again until the First (1st) of the year so you have that couple of months uh and that was, that was November Twelfth (12th) er October the Twelfth (12th) I'm sorry. Anyway, they got together some of their personal effects. It took them probably half an hour. They took their keys all of them they could find and they left.

*Transcript* at 74. Concerned that the Whitakers might enter the store without his permission, Brunner chained the door, and eventually changed the locks.

Brunner did not hear from the Whitakers again until October 22, when he received a "snotty letter" from their attorney claiming that Brunner's actions constituted a breach of the sales contract. *Id.* at 75. In late October and early November, Brunner began receiving mail addressed to the Store that revealed the Whitakers had

made inventory purchases for which they did not pay. Also, the Whitakers had neglected to pay the refuse removal bill and the Store's dumpster was removed.

On January 16, 2002, the Whitakers filed a complaint for damages against Brunner alleging conversion, breach of contract, and breach of lease. In addition, the Whitakers sought an injunction compelling Brunner to allow them to re-open the Store for business. Brunner counter-claimed, also alleging breach of contract, breach of lease, and conversion. After a hearing, the trial court denied the petition for an injunction on March 25, 2002. The trial court ordered the parties to submit their disputes to mediation, which they did without success. A bench trial was con-ducted on October 5, 2003, after which the trial court rendered the following judg-ment:

1. The Plaintiff has failed to prove conversion as alleged in Count I in that there was no completed sale of inventory and therefore judgment for the defen-dant is entered.

2. The Plaintiff has failed to estab-lish a breach of contract as alleged in Count II and therefore judgment for the defendant is entered.

3. The Plaintiff has failed to estab-lish that breach of lease as alleged in Count III therefore [sic] judgment for the defendant is entered.

4. The defendant-counterclaimant has established a breach of the sales contract as alleged in Counter-count I in that only the $50,000.00 down payment was made.

5. The defendant-counterclaimant has established a breach of the lease contract as alleged in Counter-count II in that the plaintiff allowed deterioration of the inventory from a value of $344,456.96 to $303,845.76 and by failing to maintain business liability insurance of the leased premises.

6. The defendant-counterclaimant has established conversion as alleged in Counter-count III in that Plaintiff left unpaid bills to suppliers, in Brunner's name, totaling $21,366.54.

7. The Counterclaimant is entitled to $64,099.62 due to Whitaker's conversion ($21,366.54 × 3), and to $40,611.20 due to depletion of inventory, and to $20,305.60 as lost mark-up from sale of such depleted inventory making a grand total of $84,405.22. Less the $50,000.00 paid down by the Whitakers, judgment is entered against James Whitaker and Karl Whitaker and in favor of Martin Brunner in the amount of $34,405.22.

*Appellant's Appendix* at 15–16. The Whitakers challenged the judgment with a motion to correct errors, which was de-nied. The Whitakers now appeal.

**1.**

The Whitakers challenge the trial court's determination that they are liable to Brunner for the diminution in the value of the inventory that occurred between the time of sale and the time Brunner resumed control of the Store.

This issue requires this court to construe the terms of a written contract and therefore involves a pure question of law. Our standard of review in such cases is de novo. *Estate of Penzenik v. Penz Prods., Inc.*, 800 N.E.2d 1007 (Ind.Ct.App. 2003), *trans. denied.* When construing the meaning of a contract, our primary task is to determine and effectuate the intent of the parties. *Id.* First, we must determine whether the language of the contract is ambiguous. "The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts." *Id.* at 1010. If the language of the instrument is unambiguous, the parties' intent will be

determined from the four corners of the contract. If, on the other hand, a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the factfinder. *Estate of Penzenik v. Penz Prods., Inc.*, 800 N.E.2d 1007. When interpreting a written contract, we attempt to determine the intent of the parties at the time the contract was made. We do this by examining the language used in the instrument to express their rights and duties. *Id.* We read the contract as a whole and will attempt to construe the contractual language so as not to render any words, phrases, or terms ineffective or meaningless. We must accept an interpretation of the contract that harmonizes its provisions, rather than one that places the provisions in conflict. *Id.*

This particular controversy centers upon the nature of the ownership of the inventory between the time Brunner turned the Store over to the Whitakers and the time he took it back. For purposes of this discussion, we can characterize the inventory as being fully stocked at the time the Whitakers assumed management of the Store. While they ran the Store, the inventory was depleted and not replaced. Therefore, when Brunner resumed possession and control of the Store, there was less inventory there than when the Whitakers took possession. According to Brunner, the Whitakers must compensate him for the amount of the diminution of inventory. The Whitakers counter that they purchased the inventory and therefore owned it outright during the time they ran the Store, and for that reason are not accountable to Brunner in that regard. The relevant instruments arguably could support either of the views advanced by

the parties, i.e., that the Whitakers bought the inventory outright and their ownership thereof was complete, or that their ownership was something less than that. Therefore, the contract is ambiguous in that respect.

We begin the task of resolving this ambiguity by examining the Sales Contract. In the second paragraph of that instrument, two different monetary values were assigned to the inventory. The first was a "jobber[2] cost" ($344,456.96), which for our purposes is the rough equivalent of the amount paid by a distributor such as Indiana Auto Parts to the warehouse (or wholesaler) to acquire the inventory in the first place. The second was the amount that the Whitakers were obligated to pay Brunner for the inventory ($166,000). The Sales Contract stated that the inventory was to be "sold to" the Whitakers. *Appellant's Appendix* at 8. This conveys the notion that the transfer of the inventory from Brunner to the Whitakers was an outright sale. On the other hand, the Sales Contract also imposed upon the Whitakers a duty to "take full responsibility for said inventory" and to "cause it to be kept in good salable order and condition." *Id.* More importantly, the Whitakers agreed to pay $200 per week to Brunner for "the use" of the inventory. *Id.* The latter provision sounds less like an outright sale and more like a rent or lease agreement. It appears to us that the best interpretation of the meaning of the Sales Contract in this respect lies somewhere between those two alternatives.

■ A conditional sales contract, also known as a retail installment contract, is defined as follows: "A contract for the sale of goods under which the buyer makes periodic payments and the seller retains

---

**2.** "A jobber is a person who in the chain of sales . . . typically takes merchandise and dis-

tributes it to dealers." *Transcript* at 100.

title to or a security interest in the goods." *Black's Law Dictionary* 324 (7th ed.1999). Under such an arrangement, the buyer adheres to an agreed-upon process in purchasing the subject matter of the contract, but the seller retains an interest in the subject matter until the buyer has fully performed its obligation. That would seem to accurately describe the arrangement created in the Sales Contract. The Sales Contract contemplated that the Whitakers would eventually own the inventory, as evidenced by the contractual specification that it would be "sold to" them. *Appellant's Appendix* at 8. Yet, outright transfer of ownership was not completed at the moment the contract was executed, because the contract imposed a duty upon the Whitakers to maintain the condition of the inventory, and also charged the Whitakers a fee for the right to sell (or "use", *id.*) the inventory, at least until they had completed the purchase of same. Viewed in this way, it is apparent that Brunner retained at least an equitable interest in the inventory until the purchase price of $166,000 was paid in full. Brunner's continuing interest in the inventory was further reflected in the contractual arrangement whereby the Whitakers paid him $200 per week to use that portion of the inventory that the Whitakers had not yet paid for.

We must now determine whether the duty to keep the inventory "in good salable order and condition" included the duty to keep the inventory at or near the same level as when the Whitakers assumed operation of the Store. The Whitakers would have us construe that phrase to mean that the items of inventory themselves should be kept physically in a well-maintained condition. The Whitakers contend that the phrase does not describe the size or make-up of the inventory as whole. Such a construction is at odds with the essence of the agreement memorialized in the Sales Contract. To review, that agreement specified that Brunner would sell the inventory to the Whitakers, who would pay for it in two installments. No doubt in recognition of Brunner's continuing ownership interest in the inventory during the sixty-day period between payments, the Whitakers agreed to pay Brunner $200 per week for its use. The Whitakers' duty with respect to the inventory therefore must be construed as benefiting someone other than themselves. Put another way, why would Brunner require the Whitakers to maintain the inventory in good salable order and condition for only their benefit? Clearly, that term was placed in the Sales Contract for *Brunner's* benefit, i.e., to protect his interest in the inventory. If the Whitakers' duty was as they urge, it could be discharged by selling the entire inventory except for a single headlight, so long as the headlight was kept clean and in good working order. Such would not have protected Brunner's interest in the inventory.

We note in this regard that Brunner testified he had been in the auto parts business for thirty years and therefore understood well the inventory aspects of that business. He noted that after the Whitakers assumed management of the Store, the inventory began to dwindle, including standard items that typically move well and thus were always kept well stocked. Brunner stated that in the thirty years, and especially the last ten years, he was in the business, the total value of the inventory remained "relatively constant" from one month to the next. *Transcript* at 77. That relatively constant amount was approximately $344,000. Yet, when Brunner resumed control of the Store in October 2002, the inventory had decreased by approximately $41,000, in the approximately five months that the Whitakers ran the Store.

Because Brunner retained at least partial ownership of the inventory, the Whitakers' duty to keep the inventory "in good salable order and condition", *Appellant's Appendix* at 8, included the duty to maintain the inventory at approximately the same level as when they began operating the Store. Of course, that duty would have terminated if and when the Whitakers had paid the balance of the purchase price, thereby conferring upon them complete ownership of the inventory. That did not occur, however, and therefore the Whitakers' contractual duty to keep the inventory in good order included the duty to maintain it at the original level.

## 2.

The Whitakers contend that the trial court erred in calculating the amount of damages it must pay to Brunner. To review, the trial court determined that Brunner was entitled to $40,611.20 for depletion of the inventory, $21,366.54 for bills incurred but not paid by the Whitakers while they operated the Store, and $20,305.60 as lost mark-up from the sale of the items of depleted inventory. After offsetting the $50,000 down payment, the trial court's awarded Brunner $34,405.22.

Our scope of review when considering a damage award in a breach of contract case is limited. *Abbey Villas Dev. Corp. v. Site Contractors, Inc.*, 716 N.E.2d 91 (Ind.Ct.App.1999), *trans. denied.* We do not reweigh evidence or judge witness credibility, and will consider only the evidence favorable to the award. *Id.* The damage award cannot be based on speculation, conjecture, or surmise, and must be supported by probative evidence. When injured by a breach of contract, a party's recovery is limited to the loss actually suffered. Such party may not be placed in a better position than he or she would have enjoyed if the breach had not occurred. *Id.* Accordingly, a damage award must reference some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits, or direct inference from known circumstances. *Id.* We will reverse the trial court's award only when it is not within the scope of the evidence of record. *Id.*

The Whitakers contend that the award of lost profits on the depleted inventory represents an impermissible double recovery. We agree. As reflected in the above standard of review, the award of damages should be calculated to place Brunner in the same position as if no breach had occurred. If the contract had been performed, Brunner would have received $166,000 from the Whitakers for the purchase of the inventory, and eventually an additional $350,000 from the Whitakers for the purchase of the real estate. The contract never called for Brunner to receive the profits of the sale of inventory that occurred after the Whitakers made the down payment, but before they paid the balance. In fact, the Whitakers paid Brunner $700 per week in what amounted to rent for the use of the Store's inventory and real property. Brunner does not dispute that the Whitakers made the aforementioned payments in a timely manner while they ran the Store. The double recovery inherent in the trial court's award of damages is not represented by allowing Brunner to retain the profits of the sold inventory while at the same time ordering the Whitakers to restore the inventory to the original levels. Rather, the double recovery exists in awarding to Brunner the profits realized by the business while the Whitakers operated it, *while at the same time* allowing Brunner to retain the rent the Whitakers paid to run the business. Such goes beyond merely compensating Brunner "fairly and adequately for the loss sustained", and represents a windfall.

*INS Investigations Bureau, Inc. v. Lee,* 784 N.E.2d 566, 577 (Ind.Ct.App.2003), *trans. denied.* Therefore, the award of lost profits to Brunner must be reversed. In all other respects, the damage award is affirmed.

### 3.

█ The trial court awarded Brunner treble damages for the amount of the unpaid bills incurred by the Whitakers while they ran the store, and which Brunner subsequently was forced to pay. The trial court's award of treble damages was based upon its conclusion that the Whitakers were guilty of conversion in failing to pay those bills.

█ Under Ind.Code Ann. § 34–24–3–1 (West, PREMISE through 2003 1st Regular Sess.), a person who proves the elements of criminal conversion by a preponderance of the evidence can recover up to three times the actual damages, the costs of the action, and reasonable attorney's fees. *Greco v. KMA Auto Exch., Inc.,* 765 N.E.2d 140 (Ind.Ct.App.2002). In bench trials involving breach of contract actions that include a claim for treble damages on the theory of conversion, we apply the clearly erroneous standard. *Id.* A judgment is clearly erroneous in this context when a review of the record leaves us with a firm conviction that a mistake has been made. *Id.*

Ind.Code Ann. § 35–43–4–3 (West, PREMISE through 2003 1st Regular Sess.) provides, "[a] person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion, a Class A misdemeanor." Ind.Code Ann. § 35–4–1–2–2 (West, PREMISE through 2003 1st Regular Sess.) provides that "(a) A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so. (b) A person engages in conduct 'knowingly' if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35–43–4–1(a) provides, to " 'exert control over property' means to obtain, take, carry, drive, lead away, conceal, abandon, sell, convey, encumber, or possess property, or to secure, transfer, or extend a right to property." Finally, I.C. § 35–43–4–1(b) provides, "a person's control over property of another person is 'unauthorized' if it is exerted ... without the other person's consent...."

As this court observed in *Greco v. KMA Auto Exch., Inc.,* 765 N.E.2d 140, "the mens rea requirement 'differentiates criminal conversion from the more innocent breach of contract or failure to pay a debt situation that the criminal conversion statute was not intended to cover.'" *Id.* at 147 (quoting *Gilliana v. Paniaguas,* 708 N.E.2d 895, 899 (Ind.Ct.App.1999), *trans. denied).* "The legislature did not intend to criminalize bona fide contract disputes." *Greco v. KMA Auto Exch., Inc.,* 765 N.E.2d at 147 (quoting *NationsCredit Commercial Corp. v. Grauel Enter., Inc.,* 703 N.E.2d 1072, 1078 (Ind.Ct.App.1998), *trans. denied* ).

Here, the relevant evidence indicates that the Whitakers purchased items on Brunner's accounts while they operated the business, although the Whitakers were not authorized to do so. There is evidence that the Whitakers sold at least $17,687.60 of the items purchased in that manner, keeping the proceeds for themselves, but never paying the invoices. The Whitakers' argument on this point essentially is that Brunner could not prove conversion because there was no evidence that he had been, or was ever going to be, required to pay the invoices.[3] To the contrary, Brun-

---

3. The Whitakers phrase it thus: "Absent some

showing by Mr. Brunner that the vendors

ner indicated that he was responsible for paying those invoices, as reflected in the following:

Q. Have you had the where with all [sic] to pay off all these bills?

A. [Brunner] No, I haven't.

    \*      \*      \*      \*      \*      \*

A. Here's another handful [of bills]. This is when the stuff was charged, August, this would have been their, when [the Whitakers] were in business.

Q. 2001?

A. Yeah, 2001. Sure 2001.

Q. And has anyone sued you over any of these bills?

A. Here's the paperwork they keep....

Q. Has anyone ever sued you over any of these ...

A. No they have not.

Q. And are you saying these bills have been outstanding for over a year?

A. I, I talked to every one of these people and explained to them the situation and they have been very patient.

*Transcript* at 90, 92. In another portion of his testimony on that subject, Brunner referred to a "stack" of "outstanding bills." *Id.* at 100.

The evidence reflects that the Whitakers charged inventory items on Brunner's account, sold the items, and kept the proceeds. The foregoing excerpts from Brunner's testimony permit a reasonable inference that Brunner is financially responsible for the unpaid invoices for those items. That, in turn, is sufficient to prove that the Whitakers knowingly exerted unauthorized control over Brunner's property without any contractual basis for doing

were going to attempt to hold him liable for the charges, he sustained no pecuniary loss

so. Therefore, Brunner established the elements of criminal conversion by a preponderance of the evidence.

Judgment affirmed in part, reversed in part, and remanded with instructions to re-calculate the amount of the damage award consistent with this opinion.

BAKER, J., and BAILEY, J., concur.

and there was no basis for an award of treble damages." *Brief of Appellants* at 20.