**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MARK D. HASSLER**
Hunt, Hassler & Lorenz LLP
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE:

**STEVEN K. EMERY**
**HOLLY M. HARVEY**
Bunger & Robertson
Bloomington, Indiana



FILED

Jan 25 2012, 9:27 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ELLETTSVILLE HOLDINGS, LLC, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 53A04-1103-PL-121 |
| | ) | |
| GARNETT D. KINSER, | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable E. Michael Hoff, Judge
Cause No. 53C01-0710-PL-2405

**January 25, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Ellettsville Holdings, LLC appeals from the judgment of the trial court following a bench trial in favor of Garnett Kinser (Kinser) on Ellettsville Holdings's complaint for damages based upon its claims of breach of the parties' purchase agreement and breach of warranty, including breach of the covenant of seisen. Ellettsville Holdings presents two issues for our review:

1. Did the trial court err in interpreting the terms of the parties' purchase agreement and its conclusion that Kinser met his obligations with respect thereto?

2. Did the trial court err in concluding that Kinser did not breach the warranty of seisen?

We affirm.

Ellettsville Holdings is an Indiana limited liability company and Bryan Phillips is its managing member. Phillips has been engaged in the development of commercial real estate for nearly twenty years and has completed approximately two hundred commercial development projects. Phillips was a preferred builder in west central Indiana and east central Illinois for Dollar General stores, resulting in the majority of his commercial development projects being strip malls with Dollar General as the anchor store.

In February 2002, Phillips contacted John West, a real estate agent with F.C. Tucker in Bloomington, Indiana, to discuss available properties in and around the Bloomington area that could be suitable for a commercial development to include a Dollar General store. West provided Phillips with information concerning several potential locations, including a potential site located on West State Road 46 in Ellettsville that was not then listed for sale (the Property). The Property was owned by Kinser, who had purchased the property in 1982.

Phillips drafted the purchase agreement (Purchase Agreement) for the purchase of the property. The purchase price was set out as $242,000. Throughout the negotiations regarding the sale of the Property, all communications between Phillips and Kinser occurred through West or other personnel with F.C. Tucker.[1] In negotiating the terms with West, Phillips agreed to omit any condition in the Purchase Agreement that required identification of a flood plain, noting that such would "show up" on an American Land Title Association (ALTA) survey[2] that was an essential requirement set forth in the Purchase Agreement. *Exhibit 3C*. The Purchase Agreement outlined the following terms:

> (2) **Inspection**. Buyer has had the opportunity to inspect the premises and agrees to accept it "as is" subject only to items outlined in (6) Subject to: and (7) Further Conditions:.
> * * *
> (4) **Survey**. An Alta Survey of said property shall be provided by Seller.
> * * *
> (6) **Subject to:** ALTA survey showing site can support our project, Title insurance, Utility availability, and Phase 1 audit.
> (7) **Further Conditions.** This agreement is contingent upon satisfaction of the following condition.
> > 1. Buyer's ability to obtain project financing.

*Exhibit 1*. Kinser signed the Purchase Agreement on March 19, 2002. Phillips claims that at some point thereafter, he sent West a form referred to as Table A, which is a document that sets forth optional responsibilities and specifications for an ALTA survey. In Table A, Phillips indicated that he wanted the ALTA survey of the Property to include locations of monuments, flood zone designation, land area, contours and the datum of the elevations,

---

[1] West and Kinser agree that at all relevant times, West was acting solely as Kinser's agent.

[2] An ALTA survey is a boundary survey that also identifies features of the property such as improvements and easements and further specifications if requested. An ALTA survey is subject to a higher accuracy

3

certain setback restrictions, indication of access to public ways, and location of utilities. West, however, did not have a copy of Table A in his file, and subsequent e-mails between Phillips and West indicate that West was unaware that Phillips had completed a Table A and thereby was requesting additional components to be included in the ALTA survey.[3]

In accordance with his obligation under the terms of the Purchase Agreement, Kinser hired local surveyor Doug Graham[4] to complete an ALTA survey of the Property.[5] In conducting this survey, Graham used the legal description contained on the deed to Kinser from Kinser's grantor. Graham noted on the May Survey several discrepancies between the land descriptions contained in the deed and the physical boundaries of the Property, including discrepancies with land descriptions of adjoining properties. Graham maintains that he did not have in his file a copy of Table A that Phillips completed indicating further specifications for ALTA survey. Graham completed his first survey of the Property on May 18, 2002 (the May Survey).

After receiving the May Survey from Graham, Kinser arranged to meet West at the Property so West could in turn provide the survey to Phillips. West noted that the May Survey did not include a flood-zone designation. Although Kinser took the May Survey back to Graham to correct, West went ahead and gave the May Survey to Phillips. Graham completed his second survey of the Property on June 17, 2002 (the June Survey). Kinser's

standard set forth by the American Land Title Association. An ALTA survey must be certified as such by the surveyor to the lender and the title company.

[3] Table A was not referenced in or made a part of the Purchase Agreement.

[4] Graham had been a licensed surveyor since 1995.

[5] Prior to executing the Purchase Agreement, Kinser did not know what an ALTA survey was.

4

daughter picked up the June Survey from Graham's office and delivered it to the F.C. Tucker office where West worked. Kinser did not separately deliver a copy of the June Survey to Phillips. Phillips maintains that he never received a copy of the June Survey.

There were differences between the May and June Surveys in that the June Survey contains a flood-plain designation,[6] whereas the May Survey did not.[7] Additionally, on the June Survey, the legal description/boundaries of the three parcels making up the Property were altered from what was shown in the May Survey. Specifically, on the June Survey, Graham did not use lead-ins, but rather the location of monuments that he had not located prior to completing the May Survey as the point of beginning. Graham confirmed that monuments are superior to lead-ins, and that monuments control over distances. The monuments are in the same locations on both the May and June Surveys.

At some point in the negotiations over the purchase of the Property, relocation of the sewer line running through the Property was discussed. As originally located, the sewer line prevented the Property from being developed as planned because the sewer line ran under the site of the proposed strip mall. West communicated with Phillips and Kinser regarding the need for relocation of the sewer line. An amendment to the Purchase Agreement agreed to by the parties provided that Ellettsville Holdings would receive a credit of $10,700 off the purchase price of $242,000 for the costs of relocating the sewer line. On November 18, 2002, West informed Phillips that approval for relocation of the sewer line had been

---

[6] Specifically, the June Survey indicated that a portion of the Property was located in a "Special Flood Hazard Area Inundated by 100-Year flood" and that the Property was zoned "AE" for purposes of flood insurance. *Exhibit 6*.

obtained. Included with that communication was a copy of a portion of the June Survey that contained the flood-zone designation.

The May Survey was used for purposes of providing a legal description of the Property being conveyed by the warranty deed from Kinser to Ellettsville Holdings. Nowhere in the closing documents was there any reference to the Property's location in a flood hazard area and the requirement for flood insurance.

Phillips maintains that he was never informed that the Property was located in a flood plain and further, that he walked the site before making an offer to Kinser to purchase the Property and there was nothing that put him on notice that the Property was located in a flood plain.[8] Phillips now asserts that had he been provided with the June Survey indicating the property was in a flood-hazard area, he would not have proceeded with the closing on the sale of the Property. In contrast, Kinser maintains that he inquired whether the potential buyer (i.e., Phillips) was aware the Property was in a flood plain and West assured him that it was his practice to inform potential purchasers of such fact and that although he has no specific recollection, he was sure he informed Phillips of the presence of the flood plain prior to the closing on the Property.

After receiving the May Survey and before closing, Phillips determined that his plan to build storage units at the rear of the Property was not an option. Further, Phillips had

---

[7] Another surveyor testified that it is a "fairly common practice" among surveyors to investigate flood maps and include in an ALTA survey any flood zone designation. *Transcript* at 158.

[8] Prior to making an offer to purchase the property, Phillips showed West a concept plan outlining the commercial development he was proposing for the Property, including a small strip mall with Dollar General as the anchor store, an out lot on the east side of the strip mall, and mini-warehouses at the rear of the Property.

6

requested contour lines be included in the May Survey, but nevertheless closed on his purchase of the Property without the contour information ever being provided. Phillips admitted that he had walked the Property and that he noted that the Property sloped down toward a stream at the back of the Property. Phillips did not contact the Town of Ellettsville regarding development requirements and did not contact the Monroe County Surveyor to inquire further about the Property. Phillips testified that he relies on professionals to do their job. Ellettsville Holdings and Kinser closed on the purchase of the Property on December 4, 2002.

Shortly after closing, Ellettsville Holdings was informed that the Property was in a flood-hazard zone when it sought local permitting to start development of the Property. Specifically, the Property was in an "AE" flood zone, which represents a 100-year flood zone. The effect of the Property being in a 100-year flood zone is that the owner/developer must acquire flood hazard insurance. The City of Ellettsville required Ellettsville Holdings to conduct a hydrological study and provide a report before commencing work on its development. Because of the findings in the hydrological study, the project as planned had to be redesigned. To move forward with the project, it became necessary to raise the elevation of part of the Property to a level that was two feet above the marking for the hundred-year flood, leading to extra and unexpected costs for Ellettsville Holdings development of the Property.[9] Ultimately, Ellettsville Holdings developed the Property by constructing a strip

---

[9] Ellettsville Holdings alleged that it incurred costs of $102,449.75 for the hydrological study and raising the elevation of the Project. Ellettsville Holdings further alleged that it incurred a delay of approximately ten months in completing the strip mall project due to the time needed to prepare the hydrological study and

mall thereon and secured lease agreements from its anchor tenant, Dollar General, as well as other businesses.

In June 2006, Chalfant Industries inquired about the possibility of purchasing the portion of the Property as developed. Ellettsville Holdings entered into a purchase agreement with Chalfant Industries to sell the improved real estate for $1,023,000. As part of its inquiry, Chalfant asked Ben Bledsoe, a licensed surveyor, to perform an ALTA survey of the Property. In the process, Bledsoe discovered several discrepancies between the legal description of the Property as provided in the deed conveying the Property to Ellettsville Holdings and the parcels as they sit in the field. Bledsoe referred to the problem as a "lead in" problem. *Transcript* at 156. The dimensions of the historically described tracts were within feet of what Bledsoe surveyed and the monuments on the ground. Bledsoe confirmed that the acreage between the historically described parcels and the parcels as he measured them in the field was essentially the same. Bledsoe further confirmed that all of the improvements to the Property were located within the description of the Property as Bledsoe described it to be.

In April 2006, Ellettsville Holdings entered into a purchase agreement with O'Reilly Automotive, Inc., for the sale of an out lot contained within the Property. A survey was conducted in conjunction with the sale of this portion of the Property to O'Reilly Automotive. This survey was consistent with Bledsoe's findings regarding discrepancies in the legal description of the property as contained in the May Survey by Graham.

---

report and complete the additional work to elevate the site. As a result, Ellettsville Holdings claimed it lost base rent from its anchor store (i.e., Dollar General) of $39,000 over the ten-month delay.

Ellettsville Holdings engaged in informal efforts to resolve the legal description problems with an adjacent landowner. When these efforts proved unsuccessful, Ellettsville Holdings pursued a quiet title action against the adjacent landowner and mortgagee. The parties to the quiet title action eventually entered into an agreed decree resolving the legal description errors of the Property created by the May Survey prepared by Graham.[10]

Because of the discrepancies and the unresolved dispute over the boundary lines of the Property, Chalfant Industries backed out of the purchase agreement to buy the Property and the development thereon from Ellettsville Holdings. O'Reilly Automotive moved forward with its purchase of the out lot, but paid a reduced sum given the fact that it had to raise the elevation of the Property before developing the site.

After the sale to Chalfant Industries fell through, the Property was appraised at $1,465,000. Ellettsville Holdings continues to lease to Dollar General as its anchor tenant, Papa John's, and AT&T.

On October 25, 2007, Ellettsville Holdings filed its complaint against Kinser and Lawyers Title Insurance Corporation,[11] alleging breach of the purchase agreement by Kinser, breach of warranty and misrepresentation as to the accuracy of the correct boundaries of the real estate in question, and breach of warranties created by the warranty deed, including breach of the covenant of seisin. Ellettsville Holdings sought judgment against Kinser in an amount that would fairly compensate it for the damages it sustained. A bench trial was held

---

[10] Ellettsville Holdings maintains that it incurred attorney fees and expenses of $5362.75 in pursuing and resolving the quiet title action.

[11] On November 13, 2008, Lawyers Title Insurance Corporation was dismissed from the action upon Ellettsville Holdings's motion.

August 4-5, 2010. Following the trial, the parties submitted their respective proposed findings of fact and conclusions of law. On February 9, 2011, the court issued detailed findings of fact and conclusions of law and entered judgment in favor of Kinser. The trial court concluded that Kinser complied with the terms of the purchase agreement by providing an ALTA survey, notwithstanding the fact that the May Survey provided proved to be inaccurate in some respects. The trial court further concluded that Ellettsville Holdings failed to prove its claims for breach of warranty, misrepresentation, and breach of the covenant of seisin. Ellettsville Holdings now appeals.

1.

Ellettsville Holdings argues that the trial court erred in concluding that Kinser complied with the provision of the Purchase Agreement by providing Ellettsville Holdings with an ALTA survey, i.e., the May Survey. Ellettsville Holdings contends that the trial court's interpretation of the Purchase Agreement overlooks the implied requirement that the ALTA survey provided be accurate.

The issue presented on appeal requires this court to construe the terms of the written Purchase Agreement and therefore involves a pure question of law. Our standard of review in such matters is well settled. When construing the meaning of a contract, our primary task is to determine and effectuate the intent of the parties. *Whitaker v. Brunner*, 814 N.E.2d 288 (Ind. Ct. App. 2004), *trans. denied*. First, we must determine whether the language of the contract is ambiguous. "The unambiguous language of a contract is conclusive upon the parties to the contract and upon the courts." *Id.* at 293 (quotation omitted). Thus, if the language of the instrument is unambiguous, the parties' intent will be determined from the

10

four corners of the contract. *Whitaker v. Brunner*, 814 N.E.2d 288. When, on the other hand, the language of a contract is ambiguous, its meaning must be determined by examining extrinsic evidence and its construction is a matter for the fact-finder. *Id.* If, however, the ambiguity arises because of the language used in the contract and not because of extrinsic facts, its construction is purely a question of law to be determined by the trial court. *Trustcorp Mortg. Co. v. Metro Mortg. Co., Inc.*, 867 N.E.2d 203 (Ind. Ct. App. 2007).

Under the terms of the Purchase Agreement, Kinser was obligated to provide Ellettsville Holdings with an "Alta survey." *Exhibit 1*. Ellettsville Holdings argues that implicit in this provision is an obligation for Kinser to ensure that the ALTA survey was accurate. To accept Ellettsville Holdings's interpretation of this provision would make Kinser a guarantor of the accuracy of the ALTA survey, a matter clearly outside of his general knowledge. Hence the need for Kinser to hire someone qualified to conduct an ALTA survey and certify the survey as such. Ellettsville Holdings makes no allegation that Graham was not qualified to conduct the ALTA survey or that Kinser was negligent in hiring him to perform such task.

Here, Kinser did what was required of him by the Purchase Agreement. Kinser hired a qualified surveyor to conduct an ALTA survey of the Property and provided such to Ellettsville Holdings. Just as Ellettsville Holdings was, as it claims, entitled to rely upon the May Survey because it was performed by a professional, so too was Kinser. Kinser, having no expertise in the area of ALTA surveys, hired a qualified professional to conduct the ALTA survey. The trial court properly concluded that Kinser complied with the terms of the Purchase Agreement by providing an ALTA survey to Ellettsville Holdings and that Kinser

11

was not a guarantor of the accuracy thereof. The trial court properly observed that discrepancies in the May Survey were not attributable to Kinser, but to Graham, the registered surveyor who prepared the survey.[12]

Ellettsville Holdings also argues that the Purchase Agreement clearly set forth the intent of the parties that the ALTA survey be accurate by imposing the condition on the sale of the Property that the ALTA survey show that the Property could support the proposed project. Ellettsville Holdings ignores the provision in the Purchase Agreement, which we reiterate was drafted by Phillips, that the Property was being purchased "as is" and further ignores the fact that the Property did in fact prove to be suitable for the proposed project after modifications were made to raise the Property above the 100-year flood level. While Ellettsville Holdings claims it was not informed prior to closing that the Property was located in a flood-hazard area, we note that a communication from West to Phillips concerning the relocation of the sewer line included a copy of a portion of the June survey that clearly indicated the Property was located in a flood-hazard area.

The intent of the parties as expressed in the terms of the Purchase Agreement was that Kinser provide Ellettsville Holdings with an ALTA survey. Kinser complied with this provision when he obtained an ALTA survey. There was no implied requirement that Kinser personally guarantee the accuracy of the ALTA survey, especially since such is clearly outside of his expertise. Kinser did not breach the Purchase Agreement with respect to the requirement that he provide an ALTA survey to Ellettsville Holdings.

---

[12] Although Ellettsville Holdings was not in privity of contract with Graham so as to support a contract action, Ellettsville Holdings was not without recourse as it could have asserted claims in a tort action or a claim of

12

2.

Ellettsville Holdings argues that the trial court correctly stated the law with regard to the covenant of seisin, but erred in applying that law to the conveyance in this case. The issue before this court is thus whether the trial court correctly applied the facts of this case in rendering its conclusion.

When a trial court's judgment is accompanied by specific findings and conclusions, we apply a two-tiered standard of review. *Anthony v. Indiana Farmers Mut. Ins. Group,* 846 N.E.2d 248 (Ind. Ct. App. 2006). We construe the findings liberally in support of the judgment and first consider whether the evidence supports the findings. *Id.* Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made. *Id.* Next, we must determine whether the findings support the judgment. *Id.* A judgment is clearly erroneous if the findings of fact and conclusions thereon do not support it. *Id.* We will disturb the judgment only when there is no evidence supporting the findings or the findings fail to support the judgment. *Id.* In performing this review, we do not reweigh the evidence and consider only the evidence favorable to the trial court's judgment. *Id.*

We further note that Ellettsville Holdings is appealing from a negative judgment. A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion different than that reached by the trial court. *Id.* We will reverse the negative judgment only where the decision of the trial court is contrary to law. *Id.* In making the

negligence against Graham.

13

determination whether a trial court's decision is contrary to law, we must determine if the undisputed evidence and all reasonable inferences to be drawn from that evidence lead to but one conclusion and the trial court has reached a different conclusion. *Id.*

Ind. Code Ann. § 32-17-1-2 (West, Westlaw current through 2011 1st Regular Sess.) sets forth the covenants included in a conveyance in fee simple.

> (a) A conveyance of land that is:
> > (1) worded in substance as "A.B. conveys and warrants to C.D." (insert a description of the premises) "for the sum of" (insert the consideration); and
> > (2) dated and signed, sealed, and acknowledged by the grantor;
> > is a conveyance in fee simple to the grantee and the grantee's heirs and assigns with a covenant as described in subsection (b).
> (b) A conveyance in fee simple under subsection (a) includes a covenant from the grantor for the grantor and the grantor's heirs and personal representatives that the grantor:
> > (1) is lawfully seized of the premises;
> > (2) has good right to convey the premises;
> > (3) guarantees the quiet possession of the premises;
> > (4) guarantees that the premises are free from all encumbrances; and
> > (5) will warrant and defend the title to the premises against all lawful claims.

I.C. § 32-17-1-2.

Kinser conveyed the property to Ellettsville holdings by warranty deed. A warranty deed normally contains covenants of seisin, right to convey, freedom from encumbrances, quiet enjoyment, and warranty. *See* I.C. § 32-17-1-2; *House v. First Am. Title Co.*, 883 N.E.2d 197 (Ind. Ct. App. 2008). On appeal, Ellettsville Holdings argues that Kinser breached the covenant of seisin when the warranty deed he used to convey the Property contained the incorrect legal description of the property as shown by subsequent surveys of the Property.

14

As properly noted by the trial court, to constitute a breach of the covenant of seisin, there must have been an entire want of title in the grantor when the deed was executed or a subsequent eviction by paramount title. *Hooker v. Folsom*, 4 Ind. 90 (1853). In other words, a breach of the covenant of seisin will be found only where the grantor had no title at all when he conveyed the property to the grantee. *Id.*; *see also Axtel v. Chase*, 77 Ind. 74 (1880). There is no breach of the covenant of seisin where the grantor simply conveys a bad title. *Axtel v. Chase*, 77 Ind. 74.

Here, the legal description of the Property contained in the warranty deed from Kinser to Ellettsville Holdings mirrored the legal description of the real estate contained in the deed to Kinser from the prior owner. This legal description was also consistent with the legal description of the Property that was contained on the May Survey conducted by Graham, in which Graham asserted was based upon the description in the deed to Kinser. Although a subsequent survey by Bledsoe showed that the property lines as described in the deed from Kinser and in the May Survey were incorrect, Ellettsville Holdings received substantially the same amount of acreage in its quiet title decree and in the same location as Ellettsville Holdings believed it had acquired in the deed from Kinser. Bledsoe, in fact, noted the discrepancies in the legal description of the Property and also noted that the acreage between the historical legal descriptions and the legal descriptions as he currently described the subject tracts were roughly the same. Further, the dimensions of the historically described tracts were within feet of the survey lines most recently plotted and the monuments on the ground.

15

The differences in the legal description of Kinser's deed and the subsequent survey by Bledsoe show that only a portion of the Property as described in the Kinser deed overlapped with the physical boundaries of a neighboring property. The evidence clearly shows that Kinser was not completely lacking title to the Property he conveyed by warranty deed to Ellettsville Holdings. The trial court's findings are supported by the evidence and these findings support the trial court's judgment. Ellettsville Holdings has failed to establish that the trial court's conclusion is contrary to law.

Judgment affirmed.

RILEY, J., and MATHIAS, J., concur.